**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GT Real Estate Holdings, LLC | ) Case No. 22-10505 (KBO) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

**DECLARATION OF JONATHAN HICKMAN, CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, IN SUPPORT OF THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Jonathan Hickman, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.      I am the Chief Restructuring Officer ("*CRO*") of GT Real Estate Holdings, LLC (the "*Debtor*"), a Delaware limited liability company.  I am a Managing Director at Alvarez & Marsal North America LLC ("*A&M*"), the Debtor's proposed restructuring advisor in this chapter 11 case (the "*Chapter 11 Case*"), and co-Head of A&M's North American Restructuring practice for the Southern Region.  I have over 25 years of management and restructuring experience across a range of industries, including retail, oil and gas, manufacturing, distribution, automotive, mining, financial services and construction.  I have served in numerous interim management roles, including as chief restructuring officer for each of GST Autoleather, food manufacturer, Allens, Inc., and a global manufacturer of heat transfer equipment, among others.  In addition, I was the chief executive officer of Piney Woods Resources, a coal mining company headquartered in Alabama, and have extensive experience as a financial advisor to distressed companies, including Sanchez Energy, Sable Permian Resources, Seventy Seven Energy and, most recently, Belk, Inc.

2.       I submit this declaration to assist the Court and parties in interest in understanding the commercial and legal realities that compelled the Debtor to commence the Chapter 11 Case, and to support: (1) the Debtor's petition for relief under chapter 11 of title 11 of the U.S. Code (the "***Bankruptcy Code***") filed yesterday (the "***Petition Date***"), and (2) the relief that the Debtor has requested from the Court by the applications and motions (the "***First Day Pleadings***") filed on the docket and described in summary form in this declaration.

3.       The First Day Pleadings seek necessary and appropriate relief to avoid immediate and irreparable harm to the Debtor's estate.  This relief will allow the Debtor to ensure the safety and security of the Project (as defined below) and to minimize disruptions to other activities essential to the maintenance and preservation of the Project during the pendency of the Chapter 11 Case.

4.       As CRO, I am generally familiar with the Project, as well as the Debtor's financial condition and books and records.  Except as otherwise noted, all statements contained in this declaration are based upon my personal knowledge, my discussions with the Debtor's non-legal advisors, my review of relevant documents and information concerning the Project and the Debtor's affairs, and my opinion based on my professional experience.  In making this declaration, I have relied in part on information and materials that the Debtor, my colleagues at A&M, and the Debtor's non-legal advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this declaration. Unless otherwise indicated, any financial information contained in this declaration is unaudited and subject to change, but is accurate to the best of my knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this declaration. I am authorized to submit

this declaration on behalf of the Debtor.  The compensation I am entitled to receive for serving as CRO is not tied in any way to the proposed DIP Financing (as defined below).

5.      To assist the Court in familiarizing itself with the Debtor, the Project, and the initial relief sought by the Debtor in the First Day Pleadings, this declaration is organized into five sections. Section I provides an introduction of the Debtor and the Project, and the current fiscal and political circumstances facing the Debtor.  Section II provides background information with respect to the Project and the development contracts with the City and County (as defined below). Section III provides an overview of the Debtor's organizational structure, prepetition capital structure and Vendor Claims (as defined below) arising from the Project.  Section IV describes the circumstances leading to the commencement of the Chapter 11 Case and the proposed DIP Financing.  Section V provides an overview of, and additional evidentiary support for the relief sought by, the First Day Pleadings.

## I.    Introduction

6.      The Debtor was created to own and develop a mixed-use, pedestrian-friendly community, sports, and entertainment venue in Rock Hill, South Carolina (the "*City*"), that would also include a new headquarters and practice facility for the Carolina Panthers (a National Football League team) (the "*Project*").  In 2020, the Debtor acquired 234-acres in the City, located in York County (the "*County*").  The Project is across the border from the Panthers stadium in Charlotte, North Carolina.

7.      The success of the Project depended on significant financial and political engagement from the City and the County, each of which pledged significant public support to back the Debtor's substantial private investment in South Carolina through a series of agreements among the parties.  Among other things, the City agreed to use reasonable best efforts to fund the

Project through the issuance of $225 million in public bonds.  Those bonds were to be arranged by October 31, 2020 (which subsequently was extended to February 26, 2021).

8.    In addition, on January 6, 2021, the City made a direct contribution of $20 million to the general operating bank account of the Debtor (the "***City Contribution***").  For its commitment to the Project, the County granted tax incentives to the Debtor, and, on January 19, 2021, funded a $21 million contribution to the Debtor (the "***County Contribution***" and, together with the City Contribution, the "***Contributions***"), which was also deposited into the general operating bank account of the Debtor, as further discussed below.  I am not aware of any agreement or understanding between the Debtor and the County requiring the Debtor to return or repay any portion of the County Contribution.[1]  I am also not aware of any agreement or understanding between the Debtor and the City pursuant to which the City could recover any portion of the City Contribution other than the City's right to receive from the bond trustee a portion of the proceeds from any public bonds issued by the City up to the value of the City Contribution.[2].

9.    The Debtor proceeded to spend approximately $282 million to purchase the Project site and to fund a substantial portion of the construction.  Under current market conditions, and based on the original design documents, the Debtor estimates that it would cost an additional $500 million or more to complete the Project.  For the reasons discussed below, in March 2022, the Debtor decided to suspend work on the Project.  Ultimately, the Debtor determined that the termination and rescission of its contracts with the City (following the delivery of default notices

---

[1]    The Interlocal Agreement (as defined below) contemplates the County authorizing the Debtor to undertake a road project, subject to certain "criteria," including, the County making the County Contribution, and the City's issuance of $225 million of bonds by the City.  As explained below, the City never issued such bonds.

[2]    The FCAA (as defined below) contemplates that a bond trustee for any public bonds issued by the City would pay over to the City an amount equal to $20 million from the proceeds of the public bonds in the event that the City issued $225 million of such bonds, or a lesser amount according to a formula set out in the FCAA in the event that the City issued less than $225 million of such bonds.

and the running of a cure period under the relevant agreements with the City) and the orderly wind down of the Project was the best path forward.

10.     After work on the Project was suspended, the Debtor made diligent efforts to satisfy the legitimate claims of contractors who have or would likely be entitled to have mechanic's liens against the Project under South Carolina law ("***Mechanic's Liens***").  Notwithstanding these efforts, the Debtor itself does not have the wherewithal to satisfy all legitimate claims.  Moreover, the Debtor has been receiving notices of Mechanic's Liens on the Project.  Therefore, it is in the best interest of the Debtor to address all of these various claims in an organized and equitable manner under the protection of the Bankruptcy Code and this Court's jurisdiction.  The Chapter 11 Case will provide a single forum and an orderly process for the fair, efficient and expeditious resolution of all claims against the Debtor. Those claims that are allowed will be treated fairly and as provided under the law.

11.     Promptly following the termination and rescission of the development contracts, the Debtor entered into a standstill agreement (the "***Standstill Agreement***") with the City in order to enable discussions around a consensual resolution of the future of the Project without the threat of imminent litigation.  These discussions have not yet produced an agreement, and the Debtor expects discussions to continue.

12.     As a result of the impending termination of the litigation forbearance under the Standstill Agreement, the potential for disruption and unequal treatment of creditors posed by individual creditors asserting Mechanic's Liens, and the general lack of liquidity for the Debtor needed to protect and preserve the Project on an indefinite basis, the Debtor commenced this Chapter 11 Case to (among other things):  (a) provide a centralized and efficient forum for the orderly and safe wind-down of the Project, (b) equitably address the legitimate liabilities of the

5

Debtor, and (c) preserve the Project safely and securely while pursuing a process to maximize the value of the Debtor's assets and resolve legitimate claims, in each case under the protection of the automatic stay and with the benefit of the $20 million of non-priming DIP Financing.

## II.    Background

### a.   Overview of the Debtor and the Project

13.    The Debtor was formed for the purposes of owning the site and developing the Project.  While the vision for the Project was first announced in 2019, the Debtor acquired the site in March 2020 and broke ground on the Project in July 2020.

14.    The multi-faceted site was intended to not only serve as the Panthers' new team headquarters, but also was to include indoor and outdoor practice facilities, an indoor events center, a premier orthopedic sports medicine facility, corporate office space, residential spaces and retail stores.  All of this would be surrounded by parkland-like grounds complete with bike and walking paths and a stream. A phase 1 opening for the site was scheduled for 2023.



Architect rendering of Panther practice fields.



Architect rendering of facility.



Architect rendering of paths and stream.



Architect rendering of paths, landscaping and parkland-like grounds.

15.     As of the date hereof, the Project however remains unfinished, as depicted below:



Project site as of November 29, 2021.

16.     To date, the Debtor has invested approximately $282 million on the Project.

Significant work would be required to complete the Project, which the Debtor estimates would

cost at least $500 million under current market conditions (inclusive of re-mobilization and re-bid costs for goods and services).

### b.  The Project Documents

17.    In order to facilitate the development of the Project, the Debtor, the County and the City negotiated and entered into various agreements (the "***Project Documents***") pursuant to which the Project would be developed:[3]

### i.  The FCAA

18.    On December 30, 2020, the Debtor and the City entered into that certain Finance and Construction Administration Agreement (the "***FCAA***").[4]  Under the FCAA, among other things, the Debtor agreed to undertake the construction of so-called "***Bond Funded Infrastructure***" and the City agreed to use "reasonable best efforts" to issue $225 million in public bonds, the proceeds of which were to be used to reimburse the Debtor for the expenses incurred in connection with the construction of such infrastructure.  The Bond Funded Infrastructure consists of the so-called "***Park Projects***" contemplated to be completed by the City under the Interlocal Agreement (as described and defined below) in relation to the Project, which included wet and dry utilities, storm water management, roads, curbs, gutters, bridges, culverts and stream crossings, sidewalks, signage, pools, fountains and other waterworks, lighting, seating, trash receptacles, and bike and walking paths.  Under the FCAA, the Debtor had no obligation to construct the Bond Funded Infrastructure unless the City provided a minimum of $135 million of bond funding (the "***Minimum Bond Funding Amount***") into a project fund (the "***Project Fund***")[5] by February 26,

---

[3]    The description of the Project Documents contained in this declaration are summary in nature and qualified in their entirety by the provisions of the documents referenced. To the extent anything in this declaration is inconsistent with such documents, the terms of the applicable documents shall control.

[4]    A true and correct copy of the FCAA is annexed hereto as ***Exhibit A***.

[5]    I am not aware of any segregated account set up to hold the Project Fund.  The Contributions (as defined below) were made into the general operating account of the Debtor.

2021 (the "***Bond Funding Deadline***")[6]  No amount of bond funding was received by the Bond

Funding Deadline; nor was any received thereafter.

### ii.  The LDA

19.     On the same date, the Debtor and the City entered into that certain Land

Development Agreement (the "***LDA***")[7] pursuant to which the Debtor agreed, in accordance with

the FCAA and certain other Project Documents (as defined below), to develop the Project.  The

LDA expressly provides that the Debtor has no obligations under any of the LDA, the FCAA or

the Dedication Agreement (as defined and described below), unless and until the City delivered

the Minimum Bond Funding Amount.

### iii.  The Dedication Agreement

20.     Also on December 30, 2020, the Debtor and the City entered into that certain

Dedication Agreement (the "***Dedication Agreement***"),[8] pursuant to which the City acknowledged

and agreed that, subject to the terms and conditions thereof, the Debtor would dedicate to the City,

and the City would take title to, the Bond Funded Infrastructure developed by the Debtor and

funded by the bond proceeds in the Project Fund.

### iv.  The Interlocal Agreement

21.     In connection with the Project, the City and the County entered into an Interlocal

Agreement dated as of April 17, 2020 (the "***Interlocal Agreement***")[9] pursuant to which the parties

memorialized their understanding regarding the use of funds generated by the Project.

---

[6]     The Interlocal Agreement (as defined below) referenced a requirement that the Debtor begin work on the Project within a time period following the issuance of public bonds by the City "no later than October 31, 2020."  Interlocal Agreement § 4.2(c)(iv).  That date passed prior to the execution of the FCAA and so the Debtor agreed to amend the FCAA (which was in draft form at the that time) to extend the Bond Funding Deadline to February 26, 2021.

[7]     A true and correct copy of the LDA is annexed hereto as ***Exhibit B***.

[8]     A true and correct copy of the Dedication Agreement is annexed hereto as ***Exhibit C***.

[9]     A true and correct copy of the Interlocal Agreement is annexed hereto as ***Exhibit D***.

Specifically, the Interlocal Agreement provides that such funds shall be used first as security for and to satisfy the obligations under any public bonds to be issued by the City, with any net amounts remaining allocated among the local school district, the County, Chester County,[10] and the City in accordance with various formulas set forth in the agreement.  The Debtor is not a party to the Interlocal Agreement, but is an express, intended third party beneficiary thereof.

### v.  The FILOT Agreement

22.     In consideration of the anticipated positive economic impact of the Project in the County, on April 20, 2020, the Debtor and the County entered into that certain Fee-in-Lieu-of-Tax and Incentive Agreement (the "***FILOT Agreement***").[11]  The FILOT Agreement provides tax incentives for the Debtor by establishing a lower assessment ratio for purposes of *ad valorem* taxes on the land and improvements of the Project and a set "millage" rate to apply in perpetuity so long as the fee interest in the Project and underlying land is owned by the Debtor.  The application of these incentives is subject to the Debtor or its affiliate making certain minimum capital investments and the Project meeting certain metrics for positive economic impact (e.g., creating a certain number of jobs).

### vi.  Construction Manager and Architect

23.     In addition to the Project Agreements, on March 31, 2020, the Debtor entered into a Construction Management Agreement with Mascaro/Barton Malow, a joint venture (the "***Construction Manager***"), pursuant to which the Construction Manager would manage the construction of the Project as general contractor.  Among other things, the Construction Manager subcontracted with vendors to provide the goods and services necessary to develop the Project.

---

[10]      Chester County is the "Partner County" under the Interlocal Agreement, which joined with the County to form a Joint County Industrial and Business Park that covers tracts of land underlying the Project.

[11]      A true and correct copy of the FILOT Agreement is annexed hereto as ***Exhibit E***.

On April 21, 2020, the Debtor also entered into an agreement with Populous, Inc. to serve as architect for the Project.

### III.    The Debtor's Organizational Structure, Prepetition Capital Structure, and Project Vendor Claims

#### a.    Organizational Structure

24.     The Debtor has no employees and is a Delaware limited liability company that is wholly owned by DT Sports Holding, LLC (the "***Member***"), which in turn is wholly owned by Tepper Sports Holding, Inc. (the "***Ultimate Parent***").  The Debtor owns two entities – Waterford Golf Club, LLC and Waterford Golf Club I, LLC (the "***Non-Debtor Subsidiaries***") – that in turn own and operate the Waterford Golf Club, a golf course located in Rock Hill.  The Member also is the direct or indirect parent of various other entities ("sister" companies of the Debtor), including Panthers Football, LLC (the owner and operator of the Carolina Panthers football team).

25.     A simple organizational chart depicting the ownership of the Debtor is as follows:



### b.  Prepetition Capital Structure

26.      The acquisition costs for the site of the Project and the construction costs of the Project were paid by the Debtor, which was funded with (1) capital contributions from or via the Member, (2) $163.5 million of intercompany loans from Panthers Football, LLC, (3) the City Contribution made pursuant to the FCAA and (as defined below) and (4) the County Contribution made pursuant to the Interlocal Agreement (as defined below).  Since construction on the Project was paused, the Debtor has funded payments of expenses from proceeds obtained from (i) the sale to PS Marks LLC of a parking lot adjacent to the Panthers' football stadium in Charlotte, North Carolina and (ii) the issuance of a $4 million amended and restated secured promissory note (dated May 26, 2022) and a $3.2 million secured promissory note (dated May 31, 2022), in each case issued by the Debtor to the Member (the "***Prepetition Promissory Notes***").  The Prepetition Promissory Notes are each guaranteed by the Debtor's subsidiaries and are secured by equity pledges of the Debtor's membership interests in the Non-Debtor Subsidiaries and a real property mortgage on the golf course owned by the Non-Debtor Subsidiaries.

27.      The Debtor's real estate at the site is not subject to any mortgage and the Debtor is not party to any credit agreements, bond indentures, promissory notes, or other non-trade financial credit arrangements, other than the Prepetition Promissory Notes and intercompany loans made by Panthers Football, LLC.

### c.  Project Vendor Claims

28.      Although the Debtor will seek a modest extension of the time to prepare its schedules, the Debtor intends to expeditiously prepare and file its schedules of assets and liabilities and establish a claims bar date, which will be crucial to the Debtor's objective of identifying legitimate creditor claims.  Various parties have delivered goods and rendered services to the

Construction Manager and the Project prior to the Petition Date and have a right to payment as a result (the "*Vendor Claims*").  Since suspension of the Project in March 2022, parties have provided notice of their Mechanic's Liens under South Carolina law.  The Debtor believes that all or substantially all Vendor Claims are held by the Construction Manager's subcontractors, and thus will be subsumed within the claim of the Construction Manager.  However, because the subcontractors may be entitled to Mechanic's Liens against the Debtor's property under South Carolina law, each individual subcontractor with a Mechanic's Lien that has not dissolved may have a claim against the property of the Debtor, which I am informed may be considered a claim against the Debtor under the Bankruptcy Code.  The estimated quantum of Vendor Claims (without duplicating the claims of the subcontractors and the Construction Manager) could be as high as $90 million (with a low-end estimate based on presently available information of $55 million), but the Debtor intends to use the proof of claim process to reconcile the Vendor Claims and determine on a final and equitable basis the appropriate allowed amount of such claims (as well as any other claims asserted by parties in interest).

### IV.     The Circumstances Leading to the Commencement of the Chapter 11 Case

#### a.   The City's Failure to Issue Public Bonds

29.     Each of the FCAA, the LDA and the Interlocal Agreement require that the City issue $225 million of public bonds to pay for the Bond Funded Infrastructure.  The Debtor had no obligation to commence construction on the Project until the Minimum Bond Funding Amount was placed in the Project Fund.  Nevertheless, the Debtor began incurring significant expenses in connection with the Project, including in relation to the Bond Funded Infrastructure.

30.     The Interlocal Agreement originally set October 31, 2020 as the deadline by which the City needed to issue the public bonds.  After that date came and went, the Debtor agreed under

the subsequently executed FCAA to a deadline of February 26, 2021 for the bond issuance. That date also passed without the City issuing the bonds.

31.     In discussions following the failure of the City to issue the public bonds by the deadline under the FCAA, the parties engaged in various good-faith discussions to try and find a workable commercial alternative. No such alternative could be agreed upon.

32.     Meanwhile, the Debtor continued to invest in the Project. Eventually, in light of the inability or unwillingness of the City to obtain low-cost public financing, and the significant ongoing expenditures required to continue construction, the Debtor suspended construction of the Project on March 7, 2022. At that time, the general operating account of the Debtor had a balance of $255,841.77.

**b.   Rescission of the FCAA and Special Termination of the LDA**

33.     On March 18, 2022, to protect itself from claims by the City under the FCAA and the LDA, and to preserve its rights against the City for the City's failure to perform under the FCAA, the Debtor issued to the City a notice of default of the City's obligations under the FCAA for failing to use reasonable best efforts to issue the public bonds by February 26, 2021. After the 30-day cure period under the FCAA expired with no cure by the City, on April 19, 2022, the Debtor provided a notice of special termination of the LDA and a notice of rescission of the FCAA. The City disputes the Debtor's position that the City failed to perform its obligations under the FCAA.

**c.   The City Notifies the Debtor of Purported Defaults under the FCAA**

34.     On April 29, 2022, counsel for the City issued a letter to the Debtor alleging that (1) the Debtor failed to cooperate with the City in providing information and other assistance that the City believes would have enabled the City to issue bonds sufficient to fund the Project Account with the Minimum Bond Funding Amount in early 2022, and (2) the Debtor's suspension of work

on the Project were, in each case, defaults under the FCAA.  The Debtor disputes the City's contentions, which were unsupported by any specific allegation regarding the Debtor's failure to cooperate either prior to, or after, the Bond Funding Deadline.

### d.  The County Demand Letter

35.     On May 31, 2022, counsel for the County issued a letter demanding that the Debtor return the $21 million County Contribution paid to the Debtor.  The County alleges that the Debtor's decision not to proceed with the development of the Project requires the Debtor to return the County Contribution, which, as required by the Interlocal Agreement, was funded as a direct payment to the Debtor.  The County Contribution was wired to the Debtor's general operating account and was already spent prior to the County's demand.  The Debtor disputes the County's position.

### e.  The Debtor Continued Good Faith Efforts

36.     Since the time the Debtor suspended construction of the Project, the Debtor has been coordinating with the Construction Manager to secure the Project site and protect materials and equipment.  In addition, since the suspension of construction the Debtor has made concerted efforts to pay legitimate Vendor Claims as they became due whenever possible, which has significantly reduced the amount of unpaid Vendor Claims.  Such payments were made with the new money proceeds of the Prepetition Promissory Notes, as well as the proceeds of a sale of a parking lot adjacent to Panthers stadium, which the Debtor sold on April 12, 2022 to an affiliate, PS Marks LLC, for $15.5 million, the same price the Debtor paid for it previously.  Since the suspension of construction on March 7, 2022, the Debtor has paid approximately $40 million in

16

invoices owed to vendors and service providers for the Project, all or substantially all of which may have been entitled to Mechanic's Liens.

37.     Notwithstanding the rescission of the FCAA and the special termination of the LDA by the Debtor, and the City's allegations regarding the Debtor's breach of the FCAA, the Debtor thought it was important to engage with the City in discussions regarding the future of the Project to determine if a consensual resolution of their disputes and a mutually acceptable path forward could be agreed.  Accordingly, on May 2, 2022, the Debtor and the City entered into the Standstill Agreement to facilitate those discussions.  Pursuant to its terms, the litigation forbearance in the Standstill Agreement expired at 5:00 pm prevailing Eastern Time on June 2, 2022.

### f.  Commencement of the Chapter 11 Case

38.     Vendors have begun providing notice to the Debtor of their statutory Mechanic's Liens on the Project and these notices may increase in the weeks to come.  Further, the Debtor itself lacks the liquidity needed to continue to preserve the safety and security of the Project indefinitely.[12]  Accordingly, the Debtor engaged advisors at White & Case LLP and Alvarez & Marsal North America, LLC to help the Debtor consider its options while it discussed the future of the Project with the City.  I was appointed CRO to assist the Debtor's board of managers.[13] Ultimately, the Debtor elected to commence this Chapter 11 Case for the reasons enumerated above and to accomplish the objectives described earlier in this declaration.

### g.  Proposed DIP Financing

39.     To fund the restructuring process and provide time to resolve legitimate creditor claims, the Debtor and the Member have reached an agreement on a multi-draw term loan DIP

---

[12]     As of the date of this declaration, the Debtor has approximately $1 million of available cash and faces expenses for basic safety and security of the site over the next eight weeks of approximately $3.3 million.

[13]     The Debtor's board of managers is composed of two independent managers that have no affiliation with the Debtor or any of its affiliates.

facility (the "***DIP Financing***")[14] that provides up to $20 million (inclusive of a roll-up of the May 31 Prepetition Promissory Note in the amount of $3.2 million – the May 26 Prepetition Promissory Note in the amount of $4.0 million is not subject to any roll-up).   The proceeds of the DIP Financing will fund the critical costs of ensuring the safety and security of the Project along with the other costs and expenses of the Chapter 11 Case.   The DIP Financing is secured on a non-priming basis, junior to any valid Mechanic's Liens, with minimal funding conditions and case milestones.   The Member has advised the Debtor that it is willing to consider in good faith, and participate in, or be replaced by, DIP Financing provided by parties in interest in the Chapter 11 Case or by other third-parties. The Member has provided the DIP Financing to make certain that the Debtor had the benefit of the funding necessary to commence the Chapter 11 Case.   Further, the Member has also indicated its willingness to consider in good-faith any requests from the Debtor for additional funding that would be beneficial to accomplishing the Debtor's objectives in the Chapter 11 Case as part of a chapter 11 plan that is acceptable to the Member.

## V.    The First Day Pleadings

40.    The Debtor has filed a number of First Day Pleadings in this Chapter 11 Case seeking orders granting various forms of relief intended to preserve the safety and security of the Project, facilitate the efficient administration of this Chapter 11 Case, and expedite a swift and smooth restructuring of the Debtor's balance sheet and equitable distribution of available value. The relief requested in the First Day Pleadings is necessary to allow the Debtor to operate with

---

[14]    The description of the proposed DIP Financing contained in this declaration is qualified in its entirety by the provisions of the documents evidencing the DIP Financing. To the extent anything in this declaration is inconsistent with such documents, the terms of the applicable documents shall control.

minimal disruption during the pendency of this Chapter 11 Case.  A list of the First Day Pleadings

is set forth below.

### a. Administrative Motions

- *Debtor's Application for Order Appointing Kroll Restructuring Administration LLC as Claims and Noticing Agent, Effective as of the Petition Date*; and

- *Debtor's Motion for Order (i) Extending Time to File (a) Schedules of Assets and Liabilities, (b) Schedules of Current Income and Expenditures, (c) Schedules of Executory Contracts and Unexpired Leases, and (d) Statements of Financial Affairs; (ii) Extending the Time to File Rule 2015.3 Financial Reports; and (iii) Granting Related Relief.*[15]

### b. Substantive Motions

- *Debtor's Motion for Interim and Final Orders (i) Approving Debtor's Proposed Form of Adequate Assurance of Payment to Utility Providers; (ii) Establishing Procedures for Resolving Objections by Utility Providers; (iii) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services; and (iv) Granting Related Relief*;

- *Debtor's Motion for Interim and Final Orders (i) Authorizing Continued Maintenance and Use of Prepetition Bank Account; (ii) Authorizing Continued Use of Existing Checks and Other Business Forms; (iii) Waiving the Deposit and Investment Requirements of 11 U.S.C. § 345(b); and (iv) Granting Related Relief*

- *Debtor's Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to Obtain Post-Petition Financing; (ii) Granting Liens and Super-Priority Claims, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing and (v) Granting Related Relief*

- *Debtor's Motion of Interim and Final Orders (i) Authorizing the Debtor to (a) Maintain Existing Insurance Policies,(b) Pay All of the Debtor's Insurance Obligations and (c) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies and (ii) Granting Related Relief*

41.    The Debtor seeks narrowly tailored relief through the First Day Pleadings to meet

its goals of maintaining the safety and security of the Project site and paying the necessary, critical

expenses to protect the value of the Project while the Debtor seeks a consensual resolution of any

---

[15] The Debtor is filing the this motion together with the other First Day Pleadings but it will not seek the relief requested at the first day hearing.

disputes, the future of the Project, and the treatment of Vendor Claims and other claims against the Debtor.

42.     I have reviewed each of the First Day Pleadings (including their exhibits), and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers, employees, and the Debtor's non-legal advisors.  I incorporate by reference the factual statements in each of the First Day Pleadings as though set forth herein.

43.     I believe that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtor's efforts to maximize the value of its estate.  It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims or continue selected prepetition programs, the relief requested is essential to the maintenance of the Debtor's operations and necessary to avoid immediate and irreparable harm to the Debtor's estate and creditors.

44.     The success of the Chapter 11 Case depends upon the Debtor's ability to preserve safety, security and value of the Project while the Debtor pursues restructuring and other strategic alternatives under the protection of the automatic stay.  The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

*[Remainder of this Page is Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 2, 2022

                                 _____/s/ Jonathan Hickman_____
                                 Jonathan Hickman
                                 Chief Restructuring Officer of GT Real Estate Holdings, LLC