# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GT Real Estate Holdings, LLC, | ) Case No. 22-10505 (KBO) |
| | ) |
| Debtor.[1] | ) |
| | ) |
| | ) |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

GT Real Estate Holdings, LLC, the above-captioned debtor and debtor in possession (the "***Debtor***"), respectfully files this motion (the "***Motion***") for entry of an interim order (the "***Interim DIP Order***"), substantially in the form attached hereto as <u>Exhibit A</u>, and a final order (the "***Final DIP Order***" and together with the Interim DIP Order the "***DIP Orders***") under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(e), 503 and 507 of title 11 of the United States Code (as amended, the "***Bankruptcy Code***"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-2, 9006-1, and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), *inter alia*, (a) authorizing the Debtor to access the DIP Facility (as defined herein) as set forth in the DIP Credit Agreement (as defined herein); (b) granting liens and providing superpriority claims with respect to such postpetition financing; (c) vacating and modifying the automatic stay and any other

---

[1]    The Debtor and the last four digits of its taxpayer identification number are: GT Real Estate Holdings, LLC (9589).  The location of the Debtor's principal office is 800 South Mint Street, Charlotte, NC 28202.

applicable stay to the extent necessary to implement and effectuate the terms of the Interim DIP Order and the other DIP Documents; (d) scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final DIP Order; (e) authorizing the establishment of an escrow account to fund special bonuses to hourly employees of contractors and subcontractors who have performed work on the Debtor's development project; and (f) granting related relief.  This Motion is supported by the *Declaration of Jonathan Hickman, Chief Restructuring Officer of the Debtor, in Support of the Chapter 11 Petition and First Day Pleadings* (the "***First Day Declaration***") and *the Declaration of Jonathan Hickman, Chief Restructuring Officer of the Debtor, in support of the Motion* (the "***A&M Declaration***"), both filed contemporaneously herewith.[2]  In further support of this Motion, the Debtor respectfully states as follows

## PRELIMINARY STATEMENT

1.     The Debtor's access to the DIP Facility is vital to the achievement of its principal objectives in this chapter 11 case: ensuring the safety and security of the Project (as defined below), preserving and maximizing the value of its assets for the benefit of its stakeholders, and administering a fair, efficient and timely process for resolving the claims arising from the demise of the Debtor's development project.

2.     The $20 million delayed-draw term loan facility provided by the Debtor's direct parent, DT Sports Holding, LLC, will enable the debtor, in the first instance, to undertake essential maintenance on the Project site, and will also allow the Debtor to maintain its insurance, utilities service and security detail on an ongoing basis.  During the course of the Chapter 11 Case, additional maintenance will be required to preserve the Project site and to facilitate the ultimate, value-maximizing disposition of the partially-completed Project in an orderly manner.  The

---

[2]     Capitalized terms used but not defined in this Motion have the respective meanings ascribed to such terms in the First Day Declaration, the DIP Credit Agreement (as defined herein), or the Interim Order, as applicable.

Debtor's attorneys and other advisors will play a critical role in evaluating and processing millions of dollars of claims against the estate fairly and efficiently.   All these elements of an orderly wind down depend on adequate financing, which is available to the Debtor on advantageous terms under the DIP Facility.

3.    In recognition of the contributions to the Project of the hundreds of hourly workers who were on site or scheduled to be on site when work was suspended, the DIP Facility also provides for the establishment of an escrow account solely for their benefit.  The DIP Lender intends to fund this segregated account – the Workers' Trust Escrow Account – with an amount sufficient to make a special payment equivalent to one week's wages.  Funding of the account is conditioned upon this Court's approval of the escrow arrangements, including a determination that amounts contributed to the Workers' Trust Escrow Account will not constitute property of the estate or a borrowing under the DIP Facility.  If any balance remains in the Workers' Trust Escrow Account following the completion of all distributions and payment of all expenses of administration, the balance shall revert to the Debtor and be deemed a Borrowing under the DIP Facility.

## **RELIEF REQUESTED**

4.    The Debtor seeks entry of the Interim DIP Order and Final DIP Order, authorizing the following:

(a)    ***DIP Facility***: authorizing the Debtor to obtain postpetition financing contemplated by a secured superpriority debtor-in-possession credit facility with the aggregate principal amount of up to $20,000,000 (the "***DIP Facility***"), which includes (i) $16,800,000 that will be available in multiple draws as set forth in, and subject to the terms and conditions of, the DIP Credit Agreement (the "***New Money DIP Loans***"), of which $2,000,000 will be made available upon entry of the Interim DIP Order, and (ii) a roll-up loan facility (the "***Roll-Up DIP Facility***"), pursuant to which the DIP Lender shall be deemed to make a loan under the Roll-Up DIP Facility (such loan, the "***Roll-Up DIP Loan***" and, together with the New Money DIP Loans, the "***DIP Loans***" and together with all other financial accommodations and extensions of credit under the DIP Credit Agreement and the DIP Facility, the

"***DIP Extensions of Credit***"), which Roll-Up DIP Loan shall be in an aggregate principal amount equal to the Debtor's outstanding obligations under the Subsequent Prepetition Secured Note (as defined below), which is no less than $3.2 million, and shall be deemed used to satisfy and discharge such obligations;

(b)  ***DIP Documents***: authorizing the Debtor to execute, deliver, and perform under (a) that certain *Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement* by and between, GT Real Estate Holdings, LLC, as borrower (the "***Debtor***" or "***Borrower***") and DT Sports Holding, LLC (the "***DIP Lender***"), substantially in the form attached hereto as Exhibit B (as such agreement may be amended, restated, amended and restated, extended, modified, supplemented, or replaced from time to time in accordance with its terms, the "***DIP Credit Agreement***") and (b) all other agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, restated, supplemented or otherwise modified from time to time (collectively, the "***DIP Documents***");

(c)  ***Security and Priority***: authorizing the Debtor to grant, subject and subordinate to any Permitted Liens (as defined in the Interim DIP Order) and the Carve Out (as defined below), senior liens and superpriority administrative expense status to the DIP Lender to secure the DIP Obligations (as defined in the Interim DIP Order), including continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral (as defined in the Interim DIP Order);

(d)  ***Automatic Stay***: vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the Interim DIP Order and the DIP Documents;

(e)  ***Final Hearing***: scheduling the Final Hearing to consider the relief requested herein;

(f)  ***Workers' Trust Escrow Arrangements***: approving the Workers' Trust Escrow Arrangements, authorizing the Debtor to administer the funds in accordance with the applicable provisions of the DIP Facility, and directing parties to facilitate such payments; and

(g)  ***Other Relief***: granting related relief.

## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

5.  The United States Bankruptcy Court for the District of Delaware (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012 (Sleet, C.J.).  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this chapter 11 case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

6.     The predicates for the relief requested by this Motion are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Local Rules 2002-1(b), 4001-2 and 9013-1.

7.     Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## **BACKGROUND**

### I.     **General Background**

8.     On June 1, 2022 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  The Debtor continues to operate its business and manage its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case. To date, no committees have been appointed or designated.

9.     The Debtor was created to own and a develop a mixed-use, pedestrian-friendly community, sports, and entertainment venue, that would also include a new headquarters and practice facility for the Carolina Panthers, a professional American football team, situated on a 240-acre site located in Rock Hill, South Carolina (the "***Project***").  To realize this vision, the Debtor acquired a site for the Project and entered into various agreements with the City of Rock Hill (the "***City***"), York County, South Carolina (the "***County***"), and other parties.

10.     Additional factual background and information regarding the Debtor, including its business operations, its corporate and capital structure, and the events leading to the commencement of this chapter 11 case, is set forth in detail in the First Day Declaration.

II.      **The Debtor's Prepetition Capital Structure**

11.     The Debtor has secured debt outstanding under two secured promissory notes issued to DT Sports Holding, LLC (the "***Prepetition Secured Lender***"): the first, in the principal amount of $4,000,000 (the "***First Prepetition Secured Note***") and, the second, in the principal amount of $3,200,000 (the "***Subsequent Prepetition Secured Note***" and together with the first Prepetition Secured Note, the "***Prepetition Secured Notes***" and collectively with all other agreements, documents and instruments delivered or executed in connection therewith, each as may have been amended, restated, supplemented or otherwise modified from time to time through the Petition Date, the "***Prepetition Debt Documents***").

12.     Pursuant to the Prepetition Debt Documents, as security for its obligations thereunder, the Debtor pledged its membership interests in non-debtor Waterford Golf Club, LLC ("***Waterford***", and the liens on such interests, the "***Prepetition Liens***" and such collateral, the "***Prepetition Collateral***").  Waterford guarantees the Prepetition Secured Notes and granted a mortgage on the Mortgaged Property (as defined in the Prepetition Secured Note) to the Prepetition Secured Lender.

III.     **Other Secured and Unsecured Creditors**

13.     The Project is subject to statutory mechanic's and materialmen's liens under applicable local law, which secure the Debtor's obligations to contractors, sub-contractors, and vendors for work in progress and materials supplied.  The amount of unpaid claims secured by valid, perfected and unavoidable statutory liens (the "***Secured Trade Obligations***") is unknown at this time.  However, the Debtor estimates that the Secured Trade Obligations could total as much as $90 million. See First Day Decl. ¶ 27.

**IV.     The Debtor's Need for Postpetition Financing**

14.     As described in detail in the A&M Declaration and First Day Declaration, the Debtor has minimal revenue and limited cash reserves, and as a result is unable to pay its expenses as they become due, including those expenses necessary to maintain and protect the value of the Debtor's assets.  First Day Decl. ¶ 37; A&M Decl. ¶ 6.  Without incremental capital, the Debtor will be unable to safeguard the Project and its other property, thus putting the value of the collateral held by the estate's principal creditors at risk.  First Day Decl. ¶ 37; A&M Decl. ¶ 9.  The DIP Facility provides the Debtor with that needed incremental capital.

15.     Further, the New Money DIP Loans provide the financial backing the Debtor needs to administer the Debtor's Chapter 11 Case, thereby allowing the Debtor to pursue an orderly wind down of the Project, including identifying approaches to maximize the value of the Debtor's assets and establishing a fair and efficient process to administer claims against the Debtor's estate. First Day Decl. ¶ 37; A&M Decl. ¶¶ 7-9.  Indeed, without the protections afforded by this Chapter 11 Case, many of the estate's creditors would likely rush to the courthouse to attempt to foreclose on their liens, creating a chaotic, multi-fora process where some creditors could receive windfalls and others could receive nothing.  *See* First Day Decl. ¶ 37; A&M Decl. ¶ 5.  The DIP Facility removes these risks and places creditors on an even footing.

**V.     The Debtor's Efforts to Obtain Postpetition Financing**

16.     Upon the suspension of construction at the Project, the Debtor recognized its need for a strategy to preserve and equitably distribute value to its creditors.  Accordingly, the Debtor retained A&M and White & Case LLP ("***W&C***") to assist its efforts and established a board of independent managers.  First Day Decl. ¶ 37; A&M Decl. ¶ 5.  The Debtor also formally appointed Jonathan Hickman of A&M as its Chief Restructuring Officer (the "***CRO***"), reporting directly to the Debtor's board of managers.  First Day Decl. ¶ 37; A&M Decl. ¶ 5.

17.     Within a matter of days, the Debtor, with the assistance of the CRO, A&M and W&C, developed a chapter 11 strategy that focused on creating an organized, central forum for creditors to file claims and realizing value of the estate's assets, and estimated the incremental capital required to effectuate that strategy.  A&M Decl. ¶ 7.  At the same time, the CRO and the Debtor's officers negotiated and finalized the terms of the DIP Facility with the DIP Lender.  A&M Decl. ¶ 10.

18.     Once the terms of the DIP Facility were agreed in principle with the DIP Lender, the Debtor's officers (with the assistance of A&M and the CRO), contacted at least one other potential lender with whom the Debtor has a previous relationship regarding their interest in providing junior debtor-in-possession financing (similar to the DIP Facility) on terms similar to or better than those offered by the DIP Lender.  A&M Decl. ¶ 15.  The Debtor has yet to receive a response from such lender, but believes that it would be highly unlikely for another lender to commit to equal or superior financing, given the current state of the Project and the growing number of asserted mechanic's liens compromising the value of the Debtor's principal asset, among other reasons.  *Id.*  Nevertheless, the Debtor will continue to consider alternative financing structures and lenders in advance of and following the Interim Hearing.  *Id.*

## VI.     Summary of the DIP Facility[3]

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| **DIP Borrower:** *Bankruptcy Rule 4001(c)(1)(B)* | GT Real Estate Holdings, LLC | DIP CA, Recitals |
| **DIP Lender:** *Bankruptcy Rule 4001(c)(1)(B)* | DT Sports Holding, LLC | DIP CA, Recitals |

---

[3]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| **DIP Facility:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(i)(B)* | A multiple draw senior secured superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $20,000,000, including the Roll-Up Loan. | DIP CA, Recitals |
| **DIP Roll-Up Loans:**<br>Bankruptcy Rule 4001(c)(1)(B)(ii)<br>Local Rule 4001-2(a)(i)(N),(O) | Upon entry of the Interim DIP Order, but without prejudice to the rights of parties-in-interest to challenge the validity, extent, perfection or priority of the Prepetition Liens and Prepetition Secured Notes as provided in ¶ 8(a) of the Interim DIP Order, without any further action by the Debtor, the DIP Lender shall be deemed to make the Roll-Up DIP Loan in an aggregate principal amount equal to the Debtor's outstanding obligations under the Subsequent Prepetition Secured Note, which Roll-Up DIP Loan shall be used to satisfy and discharge the Subsequent Prepetition Secured Note. | *See* DIP CA Sec 2(b); DIP Order ¶¶ 2(f), 8(a) |
| **Workers' Trust Escrow Arrangements** | Upon entry of the Interim DIP Order, the Debtor will be authorized to administer the Workers' Trust Escrow Arrangements, which means the Debtor will establish the Workers' Trust Escrow Account to hold the Workers' Trust Contribution in trust for the Workers' Trust Beneficiaries and will administer the Workers' Trust Escrow Account by the Debtor in cooperation with the Lender.  Expenses of administering the Workers' Trust Escrow Arrangements shall be made from funds in the Workers' Trust Escrow Account.  Any balance in the Workers' Trust Escrow Account following the completion of all distributions and payment of all expenses of administration shall revert to the Debtor and be deemed a Borrowing under the DIP Facility.  Neither the Workers' Trust Contribution nor the Workers' Trust Account are property of Debtor's estate (as defined in section 541 of the Bankruptcy Code),<br><br>"**Workers' Trust Escrow Account**" means the segregated account established by the Debtor to hold the $1.2 million Workers' Trust Contribution.<br><br>"**Workers' Trust Contribution**" means an amount of not less than $1.2 million to be funded by the DIP Lender into the Workers' Trust Escrow Account | *See* DIP CA Sec 2(l); DIP Order 2(l) |
| **DIP Availability:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(i)(A), (a)(iii)* | (i) upon the date of entry of the Interim DIP Order, up to $5.2 million of DIP Loans will be made available in multiple-draws (including the DIP Roll-Up Loans, the "***Interim DIP Loans***"); and,<br>(ii) upon entry of the Final DIP Order, up to $16.8 million of DIP Loans, available in multiple-draws (the "***New Money DIP Loans***") | *See* DIP CA, Recitals, § 2(a) |
| **Maturity Date:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(i)(B)* | The earliest to occur of: (a) December 31, 2022, (b) the effective date of a confirmed Acceptable Plan, and (c) the date of acceleration of the Loans or termination of the Commitment by the Lender following an Event of Default.<br><br>"**Acceptable Plan**" means a plan of reorganization for the Debtor that provides for the payment in full for all Obligations  under the DIP Facility or is otherwise acceptable to the DIP Lender. | See DIP CA, Definitions, Sec 2(e) |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| **Use of DIP Facility/Funding of Non-Debtors:** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(D) and 4001-2(a)(i)(E)* | All proceeds of the Loans shall be used solely for (i) fees, costs, and expenses (including any fees, costs, and expenses related to the DIP Facility) in relation to the Chapter 11 Case, (ii) payment of amounts due to the independent manager or managers of the Debtor, (iii) costs and expenses incurred or to be incurred by the Borrower in connection with the Project, and (iv) working capital and other general corporate purposes of the Borrower, in each case in accordance with, and subject to the limitations set forth in the DIP Credit Agreement and the DIP Order. | *See* DIP CA § 3(f) |
| **Milestones:** *Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(i)(H)* | The Borrower agrees to comply with the following milestones (the "***Milestones***"), unless otherwise agreed to in writing by the DIP Lender: <br><br>(a) on or before the third (3rd) Business Day after the Petition Date, the Interim DIP Order shall have been entered, and such order shall not have been reversed, modified, amended, stayed or vacated; <br><br>(b) on or before the thirtieth (30th) day after the entry of the Interim DIP Order, the Final DIP Order shall have been entered, and such order shall not have been reversed, modified, amended, stayed or vacated; <br><br>(c) on or before July 31, 2022, Borrower shall have filed with the Bankruptcy Court an Acceptable Plan; <br><br>(d) on or before September 30, 2022 (or such later date as agreed to by the DIP Lender in its sole discretion), the Confirmation Order shall have been entered; and <br><br>(e) on or before October 31, 2022 (or such later date as agreed to by the DIP Lender in its sole discretion), an Acceptable Plan shall have been substantially consummated (as such term is used in section 1101 of the Bankruptcy Code). | *See* DIP CA § 5(b); DIP Order ¶ 4 |
| **Interest Rate:** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B)* | The DIP Loans shall bear interest at a rate per annum equal to the Applicable Rate, and interest accruing on each Loan shall be due and payable in kind and shall be compounded on the last Business Day of each calendar month and paid in full in cash on the Maturity Date. <br><br>"***Applicable Rate***" means 8.00% *per annum*. | *See* DIP CA § 2(f) |
| **Fees:** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B)* | The DIP Lender will not be entitled to any economic fees with respect to its commitment. The DIP Lender will, however, be entitled to the reimbursement of the following costs and expenses: <br><br>(i) all reasonable and documented out-of-pocket costs and expenses in connection with the preparation of the DIP Documents, the Interim DIP Order, the Final DIP Order and any consents, amendments, waivers or other modifications thereto and in connection with the consummation and administration of the transactions contemplated hereby and thereby and in connection with the Chapter 11 Case; <br><br>(ii) all reasonable and documented out-of-pocket costs and expenses in connection with the custody or preservation of any of the Collateral; and <br><br>(iii) all reasonable and documented out-of-pocket costs and expenses, including attorneys' fees and costs of settlement, incurred by the DIP Lender in enforcing | *See* DIP CA § 8(a) |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| | any Obligations of or in collecting any payments due from the Borrower under the DIP Documents (including in connection with the sale of, collection from, or other realization upon any of the Collateral) or in connection with any refinancing or restructuring of the credit arrangements, in each case, without the need to file any applications with the Bankruptcy Court and subject to the limitations set forth in the DIP Order. | |
| **DIP Budget and Financial Reporting:** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(iii)* | The Borrower shall provide to the DIP Lender a weekly rolling cash flow forecast, in form and substance reasonably acceptable to the DIP Lender (the "***DIP Budget***")[4] that shall set forth in reasonable detail (x) all receipts and disbursements of the Borrower on a weekly basis for the immediately preceding week and (y) all receipts and disbursements of the Borrower on a cumulative basis through such DIP Budget.  An updated DIP Budget will be delivered by no later than Friday of the fourth week covered by the then-existing DIP Budget (but shall not be required to be filed with the Court). On Friday of each calendar week, commencing on Friday, June 10, 2022, the Borrower shall provide to the DIP Lender (i) a variance report comparing, on a line item basis, actual results for the previous individual week and the cumulative weeks to the amounts set forth in the then-existing DIP Budget, with each unfavorable variance of over ten (10) percent accompanied by a qualitative explanation of the relevant line items and (ii) line item detail for all cumulative cash flows since the Petition Date. The Borrower is not subject to variance covenants. | *See* DIP CA § 5(a) |
| **Conditions of Borrowing:** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | <u>Conditions Precedent to Initial Borrowing</u>.  The funding of the DIP Loans and the roll-up of the Roll-Up Loan on or after the Closing Date during the Initial Commitment Period shall be subject to the satisfaction of the following conditions precedent except as otherwise agreed between the Borrower and the DIP Lender:<br><br>(a)  The Chapter 11 Case shall have been filed in the Bankruptcy Court.<br>(b)  The Interim DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lender.<br>(c)  The Lender shall have received an initial DIP Budget, in form and substance reasonably satisfactory to the Lender, including as to all assumptions.<br>(d)  No Default or Event of Default shall exist at the time of, or immediately after giving effect to, the making of the Loans.<br>(e)  The representations and warranties of the Borrower set forth in each DIP Document shall be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) immediately prior to, and after giving effect to, the making of any DIP Loans, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were true | *See* DIP CA § 4 |

---

[4]    The DIP Budget is attached to the DIP Credit Agreement.

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| | and correct in all material respects (or, to the extent qualified by materiality, in all respects) as of such earlier date). <br><br> (f)  The DIP Lender shall have received all such agreements, instruments, approvals, and other documents, each reasonably satisfactory to the Lender in form and substance, as the DIP Lender may reasonably request. <br><br> (g)  The Borrower shall have delivered a duly completed and irrevocable Notice of Borrowing with respect to any Borrowing other than the roll up of the Roll-Up Loan. <br><br> (h)  The Borrower shall be in compliance with the terms of the Interim DIP Order. <br><br> (i)  The DIP Lender shall have received (or each shall have agreed to arrangements for) payment of all fees, costs and expenses then due and owing to the DIP Lender, in each case, to the extent invoiced at least two (2) Business Days prior to the Closing Date. <br><br> (j)  Solely with respect to the Roll-Up Loan, the Subsequent Prepetition Note contemplated to be paid with the Roll-Up Loan deemed to be made on the Interim DIP Order Date pursuant to Section 2(b) shall have been repaid, or deemed repaid, substantially concurrently with the Interim DIP Order Date. <br><br> <u>Conditions Precedent to Each Borrowing After the Closing Date</u>. The funding of DIP Loans on each date of Borrowing after the Initial Commitment Period shall be subject to the satisfaction of the following conditions precedent except as otherwise agreed between the Borrower and the DIP Lender: <br><br> (a)  The representations and warranties of the Borrower set forth in the Loan Documents shall be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) immediately prior to, and after giving effect to, the making of such DIP Loans; <br><br> (b)  No Default or Event of Default shall exist at the time of, or immediately after giving effect to, the making of such Loans; <br><br> (c)  The Borrower shall have delivered a duly completed and irrevocable Notice of Borrowing; <br><br> (d)  With respect to any Borrowing that is more than thirty (30) calendar days following entry of the Interim DIP Order, the Final DIP Order shall each be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender; <br><br> (e)  The Borrower shall be in compliance with the terms of the Final DIP Order, and the Confirmation Order, in each case to the extent such order has been entered by the Bankruptcy Court. | |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| | (f) The DIP Lender shall have received (or shall have received arrangements for) payment of all fees, costs and expenses then due and owing to the DIP Lender, in each case, to the extent invoiced at least two (2) Business Days prior to the Closing Date. | |
| **DIP Collateral**<br><br>*Bankruptcy Rule 4001(c)(l)(B)(i)*<br><br>*Local Rule 4001-2(a)(i)(G), (a)(ii)* | "***DIP Collateral***" shall mean all real and personal property of the DIP Borrower, including, without limitation: (a) all cash, money, cash equivalents, deposit accounts, securities accounts, accounts, other receivables, chattel paper, contract rights, goods and inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of its subsidiaries), furniture, fixtures, equipment, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, intellectual property, general intangibles of any kind, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments, supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action and all substitutions, books and records related to the foregoing, and accessions, loan assets and shares of the Debtor, the equity interests owned by the Debtor, and proceeds (as defined in the Uniform Commercial Code ("UCC")) of the foregoing, wherever located, including insurance or other proceeds); (b) all owned real property, all leased real property, all rents and leases from any real property interests, and all other proceeds of real property; (c) upon entry of a Final DIP Order, the proceeds of any avoidance actions brought pursuant to sections 502(d), 544, 545, 547, 548, 549 (except as set forth in clause (d) below), 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code; (d) upon entry of a Final DIP Order, the proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any postpetition transfer of the DIP Collateral or postpetition transfer of proceeds of the Notes and (e) upon entry of a Final DIP Order, the Debtor's rights under section 506(c) of the Bankruptcy Code and the proceeds thereof; provided that DIP Collateral shall not include (i) property that cannot be subject to liens pursuant to applicable law, rule, contract or regulation or restrictions of contract existing on the Closing Date or the time of entry of such contract (other than to the extent such restriction is ineffective under the UCC or other applicable law); (ii) avoidance actions brought pursuant to claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code; and (iii) other excluded property as set forth in the DIP Documents. For the avoidance of doubt, the DIP Collateral shall include all the foregoing rights, property, claims, and interests, without regard as to whether such rights, property, claims, and interests came into the Debtor's estate, or otherwise arose, after the Petition Date. | *See* DIP Order ¶ 2(d) |
| **DIP Liens and Priorities**<br><br>*Bankruptcy Rule 4001(c)(l)(B)(i)*<br><br>*Local Rule 4001-2(a)(i)(G)* | Effective immediately upon entry of the Interim DIP Order, and subject and subordinate to the Carve-Out, the DIP Lender is granted the following security interests and liens (the "***DIP Liens***"):<br><br>(a) pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected, and non-avoidable first priority senior security interests in and liens upon all DIP Collateral, whether existing on the Petition Date or thereafter acquired, that is not | *See* DIP Order ¶ 2(g) |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| | otherwise subject to valid, enforceable, perfected and non-avoidable liens that were in existence immediately prior to the Petition Date, subject and junior to the Carve-Out; and<br><br>(b) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected security interests and liens upon DIP Collateral encumbered by Permitted Liens, which security interests and liens shall be subject and subordinate to the Permitted Liens and the Carve-Out. | |
| **Carve Out:**<br>*Bankruptcy Rule 4001(c)(1)(B);*<br>*Local Rule 4001-2(a)(i)(F)* | "**Carve-Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Court and all statutory fees payable to the U.S. Trustee under Section 1930(a) of title 28 of the United States Code, together with the statutory rate of interest (without regard to the Post-Carve-Out Trigger Notice Cap (defined below)); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time (including after the Carve-Out Trigger Date (as defined below), whether by interim order, compensation or procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred or accrued by persons or firms retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and the Committee (who's such professionals, the "**Committee Professionals**" and, together with the Debtor Professionals the "**Professionals**") that are incurred on or prior to the Carve-Out Trigger Date; and (iv) the Allowed Professional Fees of the Professionals incurred on and after the first business day following the Carve-Out Trigger Date in an aggregate amount not to exceed $1,000,000 (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**"); provided that the Post-Carve-Out Trigger Notice Cap shall be reduced, dollar-for-dollar, by the amount of any fees and expenses incurred and accruing by the Debtor and paid to the applicable Professionals following delivery of the Carve-Out Trigger Notice; provided further that the Post-Carve-Out Trigger Notice Cap shall be reduced, dollar for dollar, by the amount of any prepetition retainers received by any Professional and not previously applied to fees and expenses of such Professional. For the avoidance of doubt and notwithstanding anything to the contrary contained in the Interim DIP Order or the Prepetition Debt Documents, the Carve-Out shall be senior to the DIP Liens, the DIP Superpriority Claim, and the Prepetition Liens. | *See* DIP Order ¶ 9(a) |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens:**<br>*Bankruptcy Rule 4001(c)(1)(B)(vii)* | The Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted by the Interim DIP Order. | *See* DIP Order ¶ 7 |
| **Liens on Avoidance Actions:**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi);*<br>*Local Rule 4001-2(a)(i)(U)* | See definition of DIP Collateral above, noting that liens will be granted upon entry of a Final DIP Order on the proceeds of any avoidance actions brought pursuant to sections 502(d), 544, 545, 547, 548, 549, 551, 553(b), 732(2) or 742(2) of the Bankruptcy Code, but that liens will not be granted on actions under such provisions. | *See* DIP Order ¶ 2(d) |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| **Stipulations to Prepetition Liens and Claims:** *Bankruptcy Rule 4001(c)(1)(B)(iii)* | Without prejudice to the rights of parties-in-interest to challenge the validity, extent, perfection or priority of the Prepetition Liens and Prepetition Secured Notes as provided in ¶ 8(a) of the Interim DIP Order, the Debtor stipulates the following:<br><br>(a)  that the Prepetition Liens have been properly recorded and perfected under applicable non-bankruptcy law, and are legal, valid, enforceable, non-avoidable, and not subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;<br><br>(b)  that the Prepetition Liens were granted to the Prepetition Secured Lender for fair consideration and reasonably equivalent value, and was granted contemporaneously with the making of the loans and/or commitments and other financial accommodations secured thereby;<br><br>(c)  the Prepetition Secured Notes are legal, valid, binding, and enforceable against the DIP Borrower; and<br><br>(d)  the Prepetition Secured Notes are not subject to any contest, attack, objection, recoupment, defense, counterclaim, offset, subordination, re-characterization, avoidance or other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non bankruptcy law or otherwise | *See* DIP Order ¶¶ E(iv)-(v) |
| **Limitations on Lien Investigations** *Local Rule 4001-2(a)(i)(L)* | No portion of the Carve-Out, no proceeds of the DIP Facility, the DIP Collateral or DIP Extensions of Credit, and no proceeds of the Prepetition Collateral may be used for the payment of the fees and expenses of any person incurred (i) in investigating, challenging, or in relation to the challenge of, any of the Prepetition Liens, Prepetition Secured Notes, DIP Liens, or DIP Obligations (or the value of the Prepetition Collateral or the DIP Collateral), or the initiation or prosecution of any claim or action against the Prepetition Lender or DIP Lender, including, without limitation, any claim under Chapter 5 of the Bankruptcy Code, or any state, local or foreign law, in respect of the Prepetition Secured Notes or the DIP Obligations, or (ii) in connection with any claims or causes of actions against the Releasees (as defined below), including formal or informal discovery proceedings in anticipation thereof, and/or in challenging any Prepetition Secured Notes, DIP Obligations, Prepetition Liens, or DIP Liens; provided that, if a Creditors' Committee (as defined in the Interim DIP Order) is appointed, the Creditors' Committee may investigate any potential challenges with respect to the Prepetition Secured Notes, Prepetition Debt Documents, and Prepetition Liens during the Challenge Period at an aggregate expense for such investigation (but not litigation, prosecution, objection, or challenge thereto) not to exceed, in the aggregate, an amount to be agreed by the Creditors' Committee, the Debtor, and the DIP Lender and, if no such agreement is reached, all rights for further relief with respect to such investigation budget are reserved.<br><br>"**Challenge Period**" means the seventy-five (75) calendar days following entry of the Interim DIP Order | *See* DIP Order ¶ 8(b) |
| **Releases** | Subject to entry of the Final DIP Order, the Debtor forever and irrevocably releases, discharges, and acquits (a) the DIP Lender, | *See* DIP Order ¶¶ E(x) |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)(viii)* | (b) the Prepetition Secured Lender, (c) Affiliates of the DIP Lender, and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, and predecessors and successors in interest of the DIP Lender and its Affiliates (collectively, the "***Releasees***") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition Debt Documents, the Subsequent Prepetition Secured Note and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims held by the Prepetition Secured Lender and DIP Lender.  The Debtor further waives and releases any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Note and the DIP Obligations which the Debtor now has or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of the Interim DIP Order. | |
| ***Indemnity*** *Bankruptcy Rule 4001(c)(1)(B)(ix)* | The DIP Lender shall be indemnified and held harmless by the Debtor in respect of any claim or liability incurred with respect to the DIP Facility or in any way related thereto except for claims relating to gross negligence and willful misconduct. | *See* DIP Order ¶¶ E(vi) |
| ***Events of Default:*** *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | Subject to the terms of the DIP Documents, including the default notice provisions of paragraph 17(b) of the Interim DIP Order, the "***Termination Date***" will occur at the earliest of: (i) the Maturity Date, (ii) the date that is thirty-five (35) calendar days after the Petition Date, if the Court has not entered the Final DIP Order, (iii) the date on which the Court denies approval of, or indicates that it will not approve, the Final DIP Order, (iv) the consummation of a sale of all or substantially all of the assets of the Debtor pursuant to Section 363 of the Bankruptcy Code, (v) substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization or liquidation filed in the Chapter 11 Case that is confirmed pursuant to an order entered by the Court, (vi) the acceleration of the loans and the termination of all Commitments in accordance with the terms of the DIP Documents, and (vii) the Interim DIP Order ceasing to be in full force and effect for any reason. | See DIP Order ¶ 17(a) |
| ***Waiver/Modification of the Automatic Stay:*** *Bankruptcy Rule 4001(c)(1)(B)(iv)* | Any automatic stay otherwise applicable to the DIP Lender is modified so that, upon and after the occurrence of the Termination Date, the DIP Lender shall, subject to the default notice provisions in paragraph 17(b) of the Interim DIP Order, be | See DIP Order ¶¶ 17(a), (d) |

| Term | Summary and Material Terms | Location Interim DIP Order and/or DIP Credit Agreement (the "DIP CA") |
|---|---|---|
| | immediately entitled to exercise all of its rights and remedies in respect of the DIP Collateral and the Prepetition Collateral, in accordance with the Interim DIP Order and the other DIP Documents, as applicable.<br><br>The automatic stay imposed under Section 362(a) of the Bankruptcy Code is further modified as necessary to (i) permit the Debtor to grant the DIP Liens and to incur all DIP Obligations and all liabilities and obligations under the other DIP Documents, as the case may be, and (ii) authorize the DIP Lender to retain and apply payments, and otherwise enforce its rights and remedies hereunder, subject to the provisions of the DIP Documents. | |
| *Waiver of 506(c)/Surcharge; Marshaling Waiver:*<br>*Bankruptcy Rule 4001(c)(1)(B)(x);*<br>*Local Rule 4001-2(a)(i)(V); (i)(X)* | Subject to entry of the Final DIP Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.<br><br>Further, also subject to entry of the Final DIP Order, the Debtor (and any successors thereto or any representatives thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case (as defined in the Interim DIP Order)) shall be deemed to have waived any rights, benefits or causes of action under Section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Lender, the DIP Liens, the DIP Collateral, the Prepetition Secured Lender, the Prepetition Liens or the Prepetition Collateral. | See DIP Order ¶¶ 11, 20(f) |
| *Equities of the Case*<br>*Local Rule 4001-2(a)(i)(W)* | Subject to entry of the Final DIP Order, the DIP Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) and 506(c) of the Bankruptcy Code shall not apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or the DIP Collateral. | See DIP Order ¶¶ 20(g), 2(k) |

## **BASIS FOR RELIEF**

I.    **The Debtor's Decision to Enter into the DIP Facility is a Sound Exercise of Business Judgment**

19.    Entry into the DIP Documents and obtaining access to the DIP Facility is a sound exercise of the Debtor's business judgment. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores,*

*Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *vacated on other grounds*, 607 F.3d 957 (3d Cir. 2010).

20.     The DIP Facility is the only financing option presently available to the Debtor. A&M Decl. ¶ 15.  To help bring about an orderly resolution of the Debtor's case and to limit controversy, the DIP Lender offered to provide financing on favorable terms to the Debtor.  A&M Decl. ¶ 12. Under the DIP Facility, the DIP Lender will receive no up-front commitment fees, no exit fees, no undrawn commitment fees, no premiums, no repayment or prepayment fees, no cash interest, no break-up fee, and no "no shop" protection. *Id.*  In exchange, the Debtor will be required to pay 8% interest in-kind. *Id.*  Further, the DIP Facility provides the Debtor with an unlimited number of draws that can be made with only a single business day's notice, allowing the Debtor maximum flexibility and reducing the Debtor's interest expense. *Id.*  Finally, the DIP Lender agreed to lend on a junior basis to all Permitted Liens, allowing the Debtor to avoid any costly disputes over priming. *Id.*

21.     The DIP Facility is the result of the Debtor's concerted, good faith effort to obtain credit on the most favorable terms available.  With the assistance of its legal and financial advisors, the Debtor carefully considered its options with respect to debtor-in-possession financing, and came to the reasonable conclusion that it is unlikely that a third party would offer debtor-in-

possession financing to the Debtor – much less junior priority financing with no cash interest payments – given the Debtor's lack of revenue and limited unencumbered assets.  A&M Decl. ¶ 15.  Nevertheless, as noted above, the Debtor will continue to market the facility postpetition to assess if a superior alternative is available, and would welcome offers that further reduce the Debtor's cost of capital.  *Id.*

## II.    The Debtor Should be Authorized to Grant Security Interests, Liens and Superpriority Claims Through the DIP Facility

22.    In connection with the DIP Facility, the Debtor will provide the DIP Lender with security interests, liens, and superpriority claims pursuant to section 364(c) of the Bankruptcy Code.

23.    The Debtor meets the requirements of section 364(c) of the Bankruptcy Code, which authorizes a debtor to incur secured or superpriority debt under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

24.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and consider whether (a) unencumbered credit or alternative financing without superpriority status is available to the debtor, (b) the credit transactions are necessary to preserve assets of the estate, and (c) the terms of the credit agreement

are fair, reasonable, and adequate.  *See*, *e.g.*, *In re L.A. Dodgers*, 457 B.R. at 312; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987).

25.     The Debtor has attempted to secured alternative debtor-in-possession financing proposals, but as of today no party has agreed to provide unsecured or junior secured credit to the Debtor.  A&M Decl. ¶ 15.  Indeed, the best and only available financing to the Debtor at this time is the junior secured superpriority debtor-in-possession financing from the DIP Lender.  *Id.*  As the DIP Facility and the DIP Documents provide the Debtor with the liquidity they need at the lowest cost and most favorable terms presently available, the Debtor submits that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtor is satisfied.

**III.     The DIP Facility is Necessary to Preserve the Debtor's Estate**

26.     As described in further detail in the A&M Declaration and First Day Declaration, the Debtor has insufficient cash on hand to administer the Chapter 11 Case and protect the Debtor's property and estate.  A&M Decl. ¶ 6.  Without the DIP Facility, the Debtor would be forced to liquidate assets in a "fire sale," without a fulsome marketing process, in order to fund expenses necessary to protect is remaining assets, including those payments necessary to secure and insure the Project.  *See id.*  As a result, the Debtor's estate would be worth materially less, and creditors would recover far less value, without the DIP Facility.  Further, the Debtor needs immediate access to cash to undertake essential maintenance at the Project site and to make ongoing payments for the insurance, utilities and security services necessary to keep the Project safe and secure.  *Id.*  Accordingly, if the Debtor is unable to obtain approval of the DIP Facility and the DIP Documents, the Debtor's ability to preserve the safety and security of the Project and to maximize the value of

its assets would be jeopardized.  Entry of the Interim DIP Order is therefore in the best interests of the Debtor and its estate, and is necessary to avoid irreparable harm to the Debtor's estate.

## IV.    The Terms of the DIP Facility are Appropriate

27.    As described above and in the A&M Declaration, the terms of the DIP Facility are borrower friendly, with low interest payable in kind, no fees, and maximum flexibility so that the Debtor can minimize expense during the case.  See ¶ 20, *supra*.  Further, the DIP Facility was the only postpetition financing that the Debtor could procure under these circumstances to date.  A&M Decl. ¶ 15.  In exchange for offering such attractive financing, the DIP Lender required certain terms be included in the DIP Documents, which the Debtor submits are fair and reasonable under these circumstances and should be approved.  Those terms include the following:

### A.    Roll-Up DIP Loan

28.    The proposed Interim DIP Order includes the approval of the Roll-Up DIP Facility, which has the effect of placing all amounts accrued and outstanding under the Subsequent Prepetition Secured Note into the DIP Facility.  The Roll-Up DIP Facility is fair, equitable, and in the best interest of the Debtor's estate; further, the Debtor's acceptance of the Roll-Up DIP Loan is a sound exercise of the Debtor's business judgement.

29.    Courts in this district have regularly approved roll-ups made pursuant to debtor-in-possession financing, including on an interim basis, in recognition of the fact that such terms are often needed for chapter 11 debtors to secure favorable postpetition financing.  *See, e.g.*, *In re True Religion Apparel, Inc.*, No. 20-10941 (CSS) (Bankr. D. Del. Apr. 15, 2020) [D.I. 78] (authorizing a DIP facility comprising (among other things) $1,700,000 in new money to be provided following the entry of an interim DIP order, $6,700,000 of new money to be provided following the entry of a final DIP order, and a rollup of approximately $45 million in prepetition obligations pursuant to interim order); *In re APC Automotive Techs. Intermediate Holdings, LLC*, Case No. 20- 11466

(CSS) (Bankr. D. Del. June 4, 2020) (authorizing a full roll-up of approximately $90 million of an asset-based lending (ABL) facility upon entry of an interim order); *In re Blackhawk Mining LLC*, Case No. 19-11595 (LSS) (Bankr. D. Del. Aug. 13, 2019) (authorizing an approximately $240 million DIP that included a roll-up of $70 million in prepetition term loan debt and up to $82 million of prepetition ABL debt pursuant to interim order); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1.23 billion DIP which included a full roll-up of the prepetition ABL outstanding principal of $639 million pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) [Bank. D. Del. Apr. 16, 2018) [D.I. 177] (authorizing the roll-up of prepetition loans provided by an insider of the debtor on an interim basis, applying the business judgment standard); *In re Bon-Ton Stores, Inc.*, Case No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order).[5]

30.    The Roll-Up DIP Facility is appropriate in this case for several reasons.  <u>First</u>, the DIP Lender would not commit to lend additional capital to the Debtor without the Roll-Up DIP Facility.  A&M Decl. ¶ 14.  <u>Second</u>, the DIP Lender provided the funds under the Subsequent Prepetition Secured Note within the last week, so as to permit the Debtor to make necessary payments to protect the Project and to enter chapter 11 in an organized manner.  *See* ¶ 11, *supra*. <u>Third</u>, parties-in-interest are unharmed by the roll-up, as all parties with standing to challenge the Prepetition Secured Note have such rights expressly preserved.  See Interim DIP Order, ¶ 8(a). <u>Fourth</u>, and finally, unlike cases where the rolled-up loans are much larger than the new money entering the estate, the amount of the Roll-Up DIP Loan is a fraction of the total DIP Facility and is quite small compared to the New Money DIP Loans that the DIP Lender has committed to fund.

---

[5]    Due to their voluminous nature, the order referenced in this Motion are not attached hereto.  However, each such order is available upon request.

As such, the cost of the Roll-Up DIP Loan to the Debtor's estate and its creditors is small compared to the significant benefits provided by the New Money DIP Loans.

### B.     Workers' Trust Escrow Arrangements

31.     The DIP Credit Agreement contemplates the creation of the Workers' Trust Escrow Account that the DIP Lender will fund through a separate contribution (the Workers' Trust Contribution) which will be used to make payments (the Workers Trust Distribution) to Workers' Trust Beneficiaries.

32.     The Workers' Trust Escrow Arrangements allow the Debtor and the DIP Lender to process special payments (expected to average approximately $2,500 per beneficiary) to the Workers' Trust Beneficiaries, i.e., the approximately 460 hourly workers – all employed or contracted by subcontractors – who were on site or scheduled to be on site when work on the Project was suspended. These special payments are intended to recognize the contributions of the men and women working on the Project and to mitigate the impact of the decision to suspend construction.

33.     The Debtor's role in executing the Workers' Trust Escrow Arrangements is merely administrative, and involves no meaningful expenditure of estate resources.  Specifically, the Debtor will only be responsible for establishing the Workers' Trust Escrow Account and administering the Workers' Trust Distribution.  Workers' Trust Expenses, i.e., all fees and expenses incurred by the Debtor in administering such payments, including professional fees, will be paid directly from the funds in the Workers' Trust Escrow Account.  Further, the Workers' Trust Contribution is not estate property under section 541 of the Bankruptcy Code, because it is to be held in trust for the beneficiaries, and such contribution will not be a Borrowing under the DIP Facility.  *See* DIP CA § 2(l).  Instead, only those funds remaining after payment of the

Workers' Trust Distribution and the Workers' Trust Expenses will be transferred to an operating account of the Debtor and considered an incremental borrowing under the DIP Facility. *Id*.

34.     The Lender is not willing to provide the funds for the Workers' Trust Escrow Account without assurances that those funds will be used for their intended purpose – to make the special payments to the Workers' Trust Beneficiaries – and not be diverted to pay claims against the estate or against third parties.  Therefore, the Debtor respectfully moves the Court to (i) approve its request to administer the Workers' Trust Escrow Arrangements through the DIP Facility under sections 105(a) and the 364 of the Bankruptcy Code, (ii) find that the Workers' Trust Contribution is not estate property under section 541 of the Bankruptcy Code, (iii) authorize and direct the Construction Manager, the subcontractors that employed or contracted the Workers' Trust Beneficiaries and all applicable banks and other financial institutions, to receive, process, honor, and pay any and all fund transfer requests in respect of the relief requested in this Motion, and (iv) find that these payments are not distributions on prepetition claims and are not subject to offset or other reduction other than ordinary course deductions for applicable taxes and benefits, or garnishments or other deductions required by law.

35.     As noted above, courts assess requests to enter into debtor-in-possession financing agreements pursuant to section 364 of the Bankruptcy Code under the business judgment standard, and will approve such financing agreements so long as the terms of such agreements do not subvert the provisions of, and policies underlying, the Bankruptcy Code.  *See* ¶ 19, *supra*.  Moreover, section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of a bankruptcy court, empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

36. The Debtor submits that its agreement to administer the Workers' Trust Escrow Arrangements is a sound exercise of its business judgment. Facilitating these payments will serve to mitigate the impact of the decision to suspend work on the Project and will help the Debtor facilitate its Case going forward. Further, the Debtor is best situated to administer this program, because it has the expertise and the historical knowledge and capabilities needed to efficiently identify and pay Workers' Trust Beneficiaries, with the assistance of the Construction Manager and the applicable subcontractors. Finally, administering such payments does not require the Debtor to expend any estate resources, making Workers' Trust Escrow Arrangements a win-win for both the beneficiaries of the trust and the Debtor's estate. Accordingly, the Debtor requests that the Court exercise its equitable powers under section 105(a) of the Bankruptcy Code to approve the administration of the Workers' Trust Escrow Arrangements.

### C. Liens on Avoidance Action Proceeds, 506(c) and 552 Equities of the Case Waivers, and Marshaling Waiver

37. As a further condition of lending, the DIP Lender stipulated that it would not provide the DIP Facility unless, *inter alia*, (a) the DIP Lender were granted liens on the proceeds of certain avoidance actions that arise under chapter 5 of the Bankruptcy Code, DIP Order ¶ 2(d), (b) the Final DIP Order waived any application of the equities of the case doctrine against the DIP Lender and under sections 552, DIP Order ¶¶ 20(g), 2(k), (c) the Final DIP Order waived the Debtor's rights (if any) against the DIP Lender under section 506(c), DIP Order ¶¶ 2(k), 11), and (d) the Final DIP Order specified that the DIP Lender shall not be subject to the equitable doctrine of marshaling. DIP Order ¶¶ 2(k), 20(f).

38. Courts approve the terms of debtor-in-possession financing agreements under the business judgment standard. *See*, *e.g.*, *In re L.A. Dodgers*, 457 B.R. at 313. Moreover, courts in this District regularly approve financing agreements with each of the above noted terms, including

granting liens on proceeds of avoidance actions,[6] providing waivers of the equities of the case doctrine under section 552 and rights under section 506(c) of the Bankruptcy Code,[7] and waiving the ability to assert the doctrine of marshaling.[8]

39.     The Debtor submits that each of the provisions noted above provisions are common and in the best interest of the estate, and that the Debtor's agreement to these terms is a sound exercise of business judgment.  As noted in the A&M Declaration, the DIP Lender required each of these terms to be included in the DIP Orders to reduce the DIP Lender's risk related to the DIP Loans, and the Debtor believed such terms were fair and reasonable given the favorable economic terms offered by the DIP Lender and the absence of any viable alternative financing at this time. See A&M Decl. ¶¶ 14-15.  Accordingly, the Court should approve the inclusion of each such term in the DIP Orders.

## V.     The DIP Lender Should be Deemed a Good Faith Lender under Section 364(e)

40.     The DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility and the DIP Documents are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this

---

[6] *E.g., In re MD Helicopters Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) [D.I. 205] (including proceeds of avoidance actions as DIP collateral); *In re CalPlant Holdco, LLC*, No. 21-11302 (JTD) (Bankr. D. Del. Oct. 27, 2021) [D.I. 107] (same); *In re Carbonlite Holdings LLC*, 21-10527 (JTD) (Bankr. D. Del. Apr. 12, 2021) [D.I. 274] (same).

[7] *E.g., In re EYP Group Holdings, Inc.*, 22-10367 (MFW) (Bankr. D. Del. May 25, 2022) [D.I. 149] (granting section 506(c) and 552(b) waivers); *In re The Collected Group, LLC*, No. 21-10663 (LSS) (Bankr. D. Del. May 14, 2021) [D.I. 146] (same); *In re Carbonlite Holdings LLC*, 21-10527 (JTD) (Bankr. D. Del. Apr. 12, 2021) [D.I. 274] (same); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) [D.I. 240] (same).

[8] *E.g., In re EYP Group Holdings, Inc.*, 22-10367 (MFW) (Bankr. D. Del. May 25, 2022) [D.I. 149] (granting waiver of equitable doctrine of marshaling); *In re MD Helicopters Inc.*, No. 22-10263 (KBO) (Bankr. D. Del. Apr. 26, 2022) [D.I. 205] (same); *In re Sequential Brands Group, Inc.*, No. 21-11194 (JTD) (Bankr. D. Del. Sept. 21, 2021) [D.I. 110] (same); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) [D.I. 240] (same).

section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

41.     The Debtor submits that the DIP Facility and the DIP Documents embody the most favorable terms on which the Debtor could obtain debtor-in-possession financing under the circumstances.  As described above and in the A&M Declaration, all negotiations of the DIP Documents with the DIP Lender were conducted in good faith, and the terms and conditions of the DIP Documents, including the pricing, flexibility, case milestones, and collateral coverage are fair and reasonable.  A&M Decl. ¶¶ 17-19.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Documents. Further, no consideration will be provided to any party to the DIP Documents other than as described herein and in the DIP Documents.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section.

**VI.    The Automatic Stay Should be Modified on a Limited Basis**

42.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to permit the Debtor to, among other things, (i) make any filings, deliver any notices, make recordations, perform any searches, enter into control agreements, or take any other acts as may be necessary under state law or other applicable law or otherwise desirable in order to protect, preserve and/or enforce the security, perfection, or priority of the DIP Liens, (ii) incur all liabilities and obligations to the DIP Lender as contemplated in the DIP Documents, and (iii) authorize the DIP Lender to retain and apply payments, and

otherwise enforce their respective rights and remedies, in accordance with the DIP Loan Documents.

43. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtor's business judgment, are reasonable and fair under the circumstances of this Chapter 11 Case. *See, e.g., In re EYP Grp. Holdings, Inc.*, No. 22-10367 (MFW) (Bankr. D. Del. May 25, 2022) [D.I. 149]*; In re Sequential Brands Grp, Inc.*, No. 21-11194 (JTD) (Bankr. D. Del. Sept. 21, 2021) [D.I. 110]; *In re Exide Holdings, Inc.*, Case No. 20-11157 (CSS) (Bankr. D. Del. May 21, 2020) [D.I. 123]; *In re Checkout Holding Corp.*, Case No. 18-12794 (KG) (Bankr. D. Del. Dec. 13, 2018) [D.I. 105]; *In re Mattress Firm, Inc.*, Case No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018) [D.I. 184]; *In re NORDAM Grp.,* Inc., Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) [D.I. 85]; *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) [D.I. 130].[9]

## REQUEST FOR HEARING AND AUTHORITY TO MAKE INTERIM BORROWING UNDER THE DIP FACILITY

44. Rule 4001(c) of the Bankruptcy Rules provides that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion. Fed. R. Bankr. P. 4001(c). Upon request, however, this Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., *In re Simasko*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also *In re Ames Dep't Stores*, 115 B.R. at 38. After the 14-day

---

[9] Due to their voluminous nature, these orders are not attached to this Motion, but are available on request.

period, the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. See, e.g., *Ames Dep't Stores*, 115 B.R. at 36.

45.     Pursuant to Rule 4001(c) of the Bankruptcy Rules, the Debtor respectfully requests that this Court conduct a preliminary hearing on the Motion and authorize the Debtor from the entry of the Interim DIP Order until the Final Hearing to obtain access to up to $2 million of the New Money DIP Loans and all of the Roll-Up DIP Loans (the "***Interim DIP Loans***") upon the date of entry of the Interim DIP Order to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing on the Motion.  Unless the DIP Facility is approved on an interim basis as requested, the Debtor will not have sufficient liquidity to bridge to a final hearing and the Debtor's estate would thereby be severely negatively impacted.

## SCHEDULING FINAL HEARING

46.     The Debtor respectfully requests that the Court schedule the Final Hearing and set a deadline to object to entry of the Final DIP Order as set forth in the proposed Interim DIP Order.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

47.     To implement the foregoing successfully, and given the nature of the relief requested herein, the Debtor respectfully requests a finding that (x) the notice requirements under Bankruptcy Rule 6004(a) are met and (y) the 14-day stay under Bankruptcy Rule 6004(h) is waived.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As explained above, in the A&M Declaration, and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and

granting a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## **BANKRUPTCY RULE 4001(a)(3)**

48.    The Debtor requests a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides that "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Facility is essential to prevent irreparable damage to the Debtor's estate.  Accordingly, ample cause exists to justify the waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## **RESERVATION OF RIGHTS**

49.    The Debtor reserves all rights.  Without limiting the generality of the foregoing, except as expressly provided herein or in the DIP Documents, nothing contained herein is or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a the Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (g) a waiver or limitation of the Debtor's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other

encumbrance of property of the Debtor's estate; and (i) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

## **NOTICE**

50.     The Debtor will provide notice of this Motion to the following parties: (a) the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the proposed DIP Lender; (d) the Construction Manager; (e) the United States Attorney for the District of Delaware; (f) the state attorney general for South Carolina; (g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission; (i) the City; (j) the County; (k) the South Carolina Department of Revenue; (l) the Insurance Carriers on the Schedule of Insurance Policies; (m) all applicable banks and other financial institutions; (n) any such other party entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m); and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in view of the nature of the relief requested, such notice is sufficient and no other or further notice need be provided.

## **NO PRIOR REQUEST**

51.     No previous request for the relief sought herein has been made by the Debtor to this or any other Court.

[*Remainder of page intentionally left blank.*]

## **CONCLUSION**

The Debtor respectfully requests that the Court enter the Interim DIP Order, substantially in the form[s] attached hereto, granting the relief requested in this Motion and such other and further relief as the Court deems appropriate under the circumstances.

Dated: June 2, 2022                                     Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Joseph J. Farnan, Jr. (Bar No. 100245)
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone:        (302) 777-0300
Email:            farnan@farnanlaw.com
                  bfarnan@farnanlaw.com
                  mfarnan@farnanlaw.com

**WHITE & CASE LLP**
Thomas E Lauria (*pro hac vice* pending*)*
Varoon Sachdev (*pro hac vice* pending*)*
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone:        (305) 371-2700
Email:            tlauria@whitecase.com
                  varoon.sachdev@whitecase.com

Stephen Moeller-Sally (*pro hac vice* pending)
Mark Franke (*pro hac vice* pending)
Brandon Batzel (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020
Telephone:        (212) 446-4800
Email:            ssally@whitecase.com
                  mark.franke@whitecase.com
                  brandon.batzel@whitecase.com

William A. Guerrieri (*pro hac vice* pending)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone:        (312) 881-5400
Email:            william.guerrieri@whitecase.com
*Proposed Counsel to the Debtor and*
*Debtor-in-Possession*