**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GT Real Estate Holdings, LLC | ) Case No. 22-10505 (KBO) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |

**DECLARATION OF JONATHAN HICKMAN, CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

I, Jonathan Hickman, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("*CRO*") of GT Real Estate Holdings, LLC (the "*Debtor*"), a Delaware limited liability company.  I am a Managing Director at Alvarez & Marsal North America, LLC ("*A&M*"), the Debtor's proposed restructuring advisor in this chapter 11 case (the "*Chapter 11 Case*"), and co-Head of A&M's North American Restructuring practice for the Southern Region.[1] I am over the age of 18 and qualified to submit this declaration (the "*Declaration*").

2.      I submit this Declaration in support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "*Motion*").  Capitalized terms used but not defined herein shall

---

[1]    Additional information regarding my background, qualifications, and relationship to the Debtor is found in the *Declaration of Jonathan Hickman, Chief Restructuring Officer of the Debtor, in Support of the Chapter 11 Petition and First Day Pleadings* (the "*First Day Declaration*") filed contemporaneously herewith.

have the meanings ascribed to such terms in the Motion. The statements included herein reflect my first-hand knowledge and my understanding of various representations made by the Debtor's officers, employees, board of managers, and non-legal advisors to me in my capacity as CRO, my review of relevant documents and information, and my opinion based on my professional experience. In making this Declaration, I have relied in part on information and materials that the Debtor, my colleagues at A&M, and the Debtor's non-legal advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and for my benefit in preparing this Declaration. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor and A&M. I am not being compensated specifically for this testimony other than through payments received by A&M as a professional to be retained by the Debtor and my compensation as CRO of the Debtor.

## RELEVANT BACKGROUND AND QUALIFICATIONS

3.      I have over twenty-five years' experience assisting parties-in-interest in chapter 11 proceedings and various restructuring processes, often serving as financial advisor, restructuring advisor, CRO, or some combination of such roles. Recent chapter 11 cases where I have publicly served parties-in-interest as financial advisor, restructuring advisor, and/or CRO include: *In re Belk Inc.*, No. 21-30630 (MI) (Bankr. S. D. Tex. Feb. 23, 2021); *In re Sable Permian Resources, LLC*, No. 20-33193 (MI) (Bankr. S.D. Tex. Jun 25, 2020); *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug 11, 2019); *In re GST AutoLeather Holdco Corp.*, No. 17-12101 (LSS) (Bankr. D. Del. Oct 3, 2017); *In re Seventy Seven Finance Inc.*, No. 16-11409 (LSS) (Bankr. D. Del. Jun 07, 2016).

**A&M'S RETENTION**

4.        On March 23, 2022, following suspension of construction on the Project, the Debtor's counsel retained the services of A&M's Infrastructure and Capital Markets team to assist the Debtor in assessing the status of the various components of the Project and to develop an operational strategy that would allow the Debtor to maintain the Project site and preserve the value of the Debtor's assets.

5.        On May 25, 2022, as construction vendors began filing lien notices against the Debtor given the suspension of the Project, the Debtor retained a team of professionals from A&M's Commercial Restructuring practice, led by me, to assist the Debtor in, among other things, formulating restructuring plans and/or strategic alternatives for maximizing the enterprise value of the Debtor.  The Debtor retained me as CRO in conjunction with its retention of A&M, where I report directly to the Debtor's board of managers (comprised of two independent managers that have no affiliation with the Debtor or any of its affiliates).

**THE DEBTOR'S NEED FOR POSTPETITION FINANCING**

6.        The Debtor has no revenue and limited cash reserves, with approximately $1 million of available cash on hand.  As a result, the Debtor is unable to pay its expenses as they become due, including those expenses necessary to maintain and protect the value of the Debtor's assets.  These vital costs that the Debtor must address include payments for (i) essential environmental maintenance at the Project site, (ii) insurance premiums, (iii) utilities services, and (iv) security to protect the site.[2]

7.        Accordingly, the Debtor, with the assistance of A&M, the CRO and counsel, has developed a chapter 11 strategy to protect the Debtor's assets and bring about an orderly wind

---

[2]    A detailed breakdown of the Debtor's anticipated expenses for the next thirteen weeks is found in the DIP Budget.

down of the Project.  That strategy centers on (i) providing a centralized and efficient forum for the orderly and safe wind-down of the Project, (ii) equitably addressing the legitimate liabilities of the Debtor, and (iii) preserving the Project safely and securely while pursuing a process to maximize the value of the Debtor's assets and resolving legitimate claims.

8.      A&M worked closely with the Debtor to estimate the costs to be incurred to effectuate the Debtor's strategy, which helped inform the Debtor of its financing requirement during its Chapter 11 Case and the sizing of the DIP Facility.  I believe the aggregate size of the DIP Facility, including the size of the Interim DIP Loans, is fair, reasonable, and necessary for the Debtor to successfully prosecute its Chapter 11 Case.

9.      Capital provided by the DIP Facility is vital to the Debtor's ability to safeguard the Project and its property.  Without such funds, the value of the estate will be at risk and the Debtor's ability to provide creditors with meaningful recoveries will be diminished.  Indeed, without the ability to pay for ordinary course environmental maintenance, insurance and a security detail, the Debtor could be exposed to substantial and unnecessary administrative claims arising, among other things, from land erosion or personal injury.  Moreover, the capital provided under the DIP Facility will allow the Debtor to (i) perform additional maintenance at the site needed to maximize the value of the Debtor's principal asset, and (ii) retain engineering, legal, and financial professionals to assist the Debtor in addressing the partially-completed Project in a value-maximizing manner and processing millions of dollars of claims against the estate fairly and efficiently.

## THE DEBTOR'S EFFORTS TO OBTAIN POSTPETITION FINANCING

10.      The Debtor and its officers, with the assistance of counsel and A&M, negotiated the terms of the DIP Facility with the Debtor's member (the proposed "***DIP Lender***"), which is represented by separate counsel.  The DIP Lender was an obvious potential financing source, given that the Debtor has historically been financed by its affiliates.  Further, the DIP Lender has a deep

understanding of the Debtor's financial and operational status and provided capital to the Debtor prepetition, following suspension of construction at the Project site.[3]

11.    The DIP Lender expressed a desire to help the Debtor bring about an orderly resolution of the Debtor's financial circumstances.  Accordingly, the DIP Lender offered to provide the proposed DIP Facility to the Debtor, which is comprised of up to $20 million of term loans, $5.2 million of which will be available upon entry of the Interim DIP Order (inclusive of the Roll-Up DIP Loan).  The proceeds of the DIP Facility will be used in accordance with the DIP Budget, and will allow the Debtor to preserve and protect its assets and execute its chapter 11 strategy described above.

12.    The proposed DIP Facility contains a number of favorable terms, which, in my experience, would typically be unavailable to companies like the Debtor, with limited liquid assets, no ongoing operations, and a large but unknown pool of secured creditors with first-priority liens on assets.  Such favorable terms include the following:

- Junior liens (rather than senior, priming liens) on encumbered assets;

- Interest at 8.00% *per annum*, payable in kind;

- No financing fees, including no up-front commitment fees, exit fees, undrawn commitment fees, repayment or prepayment/make-whole fees, or break-up fees;

- Unlimited draws, with no minimum draw amount, available on one business day's notice; and

- No financial covenants, including no minimum liquidity or budget variance covenants.

---

[3]    *See* First Day Decl. ¶ 26 (describing the DIP Lender's efforts to finance the Debtor following suspension of the Project).

13.     Further, the DIP Lender, at the request of the Debtor, agreed to fund the $1.2 million Workers' Trust Escrow Account, through which the Debtor will execute the Workers' Trust Escrow Arrangements. This facility will provide approximately 460 independent contractors and laborers with payments equal to one-week's wages, which average approximately $2,500, as a special payment. The workers eligible for these payments are the hourly workers who were on site or scheduled to be on site when work on the Project was suspended. These payments are intended to compensate the many workers who lost employment at the Project.

14.     In exchange for the favorable terms provided under the DIP Facility, the Debtor agreed, at the request of the DIP Lender, to certain undertakings, which I believe were entirely appropriate under the circumstances. Specifically, the DIP Lender required the inclusion of the $3.2 million Roll-Up DIP Loan Facility, which will be used to satisfy the Subsequent Prepetition Secured Note. The DIP Lender also required, among other things, first priority liens on all unencumbered assets, junior liens on all encumbered assets, and other protections included in the proposed Interim DIP Order. In my opinion, the inclusion of these terms were entirely appropriate given the Debtor's current financial position.

15.     The current state of the Project, the disputes with local authorities, and the various notices of lien entitlements against the Debtor's property, among other factors, present significant challenges to obtaining alternative sources of financing. Nevertheless, prior to and immediately following the filing of this Chapter 11 Case, the Debtor has solicited a proposal for postpetition financing from an alternative source. Specifically, certain Debtor representatives asked a third-party lender with whom the Debtor already has an established relationship if that lender could offer equal or better terms for postpetition financing than those contemplated under the DIP Facility. As of the filing of this Declaration, the Debtor has received no response from that lender. The

Debtor will continue to consider alternative financing opportunities both before and after the Interim Hearing.  As noted above, the DIP Facility contains no prepayment penalties or make-whole fees, providing the Debtor with the flexibility to accept an alternative proposal should one materialize.

## THE PROPOSED DIP FACILITY HAS BEEN NEGOTIATED AT ARMS'-LENGTH IN GOOD FAITH

16.     The Debtor's negotiations with the DIP Lender were conducted in good faith, and at arm's length.  Prior to agreeing to the DIP Facility, the Debtor's member appointed two independent board members who are responsible for managing the Debtor's estate.  These independent board members reviewed and ultimately approved the terms of the DIP Facility.  The DIP Lender and Debtor were represented by separate counsel when negotiating the transaction, and to my knowledge the DIP Lender did not influence or interfere with the Debtor's board of managers as it made its decision to file the Debtor's chapter 11 petition and enter into the DIP Facility.

17.     The Debtor is aware that it was unable to market the DIP Facility for an extended period before it was forced to file its chapter 11 petition.  As noted above, the Debtor will continue to consider offers made for replacement debtor-in-possession financing on terms that are superior for the Debtor's estate.

18.     Based upon my observations of and involvement in the debtor-in-possession financing process, the negotiations with the DIP Lender and the other potential lender have been conducted in good faith.  Those negotiations resulted in the proposed DIP Facility, which, based upon my experience, is reasonable when evaluated within the backdrop of the Debtor's financial position and current market conditions.  Indeed, I believe it unlikely that the Debtor would be able

to secure a junior priority debtor-in-possession loan similar to the DIP Facility from any lender

other than the DIP Lender.

## THE PROPOSED DIP FACILITY IS THE BEST OPTION CURRENTLY AVAILABLE TO THE DEBTOR

19.     As noted above, there is no alternative financing proposal that is equal or superior

to the DIP Facility.  As such, it is reasonable and appropriate to seek the approval of the DIP

Facility on a secured basis since the Debtor could not, prior to filing, secure other financing on an

unsecured basis or otherwise.

20.     Additionally, based on my experience and review of typical chapter 11 debtor-in-

possession financings and the current market, the fees, expenses and other economic terms of the

proposed DIP Facility are fair and reasonable under the circumstances and are below what one

would reasonably expect the market to bear for the Debtor.

21.     Based on the Debtor's cash flow projections (described in the DIP Budget attached

to the Motion), the proposed DIP Facility is expected to provide the Debtor with the liquidity

necessary to pursue a successful Chapter 11 Case and maximize the value of the Debtor's assets

and resolve its legitimate claims.  As such, entry into the DIP Documents is in the best interests of

the Debtor, its creditors, and all other parties in interest.

22.     Accordingly, based on the foregoing, I believe that the financing proposed in the

Motion reflects the best possible terms available under the circumstances and should be approved

by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Dated: June 2, 2022

/s/ Jonathan Hickman_____
Jonathan Hickman
Chief Restructuring Officer of GT Real
Estate Holdings, LLC
