**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*<br><br>GT Real Estate Holdings, LLC<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 22-10505 (KBO)<br><br>**Hearing Date: June 29, 2022 at 10:00 a.m. (ET)**<br>**Obj. Deadline: June 22, 2022 at 4:00 p.m. (ET)**<br><br>**Re: Docket No. 9** |

**OBJECTION OF CITY OF ROCK HILL TO THE DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

The City of Rock Hill, a political subdivision of the State of South Carolina (the "City") hereby objects (the "Objection")[2] to the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Super-Priority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related* [Docket No. 9] (the "Motion").[3] In support of this Objection, the City respectfully states as follows:

---

[1] The Debtor and the last four digits of its taxpayer identification number are: GT Real Estate Holdings, LLC (9589). The location of the Debtor's principal office is 800 South Mint Street, Charlotte, NC 28202.

[2] Pursuant to Rule 9013-1(h) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the City consents to the entry of final orders or judgments by the United States Bankruptcy Court for the District of Delaware (the "Court") related to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

[3] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT[4]

The Debtor purports to have filed this Chapter 11 case in order to effectuate the orderly wind down of the Project, including the resolution of legitimate claims in connection therewith.[5] However, the proposed DIP Facility lays bare the Debtor's true motives for filing a Chapter 11 case as opposed to a case under Chapter 7. The Debtor and its Parent carefully crafted the DIP Facility to foreclose any realistic possibility that an alternative debtor-in-possession facility will materialize, to ensure that the Parent maintains control over the Debtor's chapter 11 case whilst receiving broad releases. Indeed, through the proposed Final DIP Order, the Debtor seeks absolution for its Parent and a host of unknown affiliates and subsidiaries from culpability for unknown claims, causes of action, and other liabilities. The Debtor does not even attempt to establish the requisite evidentiary record for approval of an insider debtor-in-possession facility, despite seeking inappropriately broad releases, seeking to expand the existing collateral package of the Parent with respect to prepetition notes that were issued mere days before the Petition Date, and granting the Parent liens on unencumbered collateral, the value of which is unknown. For the reasons set forth in this Objection, the Motion should be denied, or, in the alternative, the Final DIP Order should be modified as described herein.

## BACKGROUND

### *A. General Background*

1. On June 1, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court (this "Case"). The Debtor continues to

[4] Capitalized terms utilized in this Preliminary Statement shall have the meanings ascribed to such terms below or in the Motion, as applicable.

[5] *See* First Day Declaration, ¶ 9, 12; A&M Declaration, ¶ 7.

operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

2. On June 2, 2022, the Debtor filed the Motion seeking approval of the DIP Facility, under which the Debtor's direct parent (and pre-petition lender), DT Sports Holding, LLC (the "DIP Lender" or the "Parent"), would provide the DIP Facility.

3. In support of the relief requested in the Motion, the Debtor submitted the *Declaration of Jonathan Hickman, Chief Restructuring Officer of the Debtor, in Support of the Chapter 11 Petition and First Day Pleadings* [Docket No. 8] (the "First Day Declaration") and the *Declaration of Jonathan Hickman, Chief Restructuring Officer of the Debtor, in Support of Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Super-Priority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 10] (the "A&M Declaration").

4. On June 6, 2022, the Court entered its *Interim Order Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtor to Obtain Secured Superpriority Postpetition Financing and Grant Liens and Superpriority Administrative Claims, and (II) Granting Related Relief* [Docket No. 53] (the "Interim DIP Order").

5. A hearing to approve the Motion on a final basis is scheduled on June 29, 2022, at 10:00 a.m. (EDT) (the "Final Hearing").

***B. The Project***

6. The City is a counterparty with the Debtor under numerous contracts and agreements related to the Project, including, but not limited to, the following:

a. That certain Finance Construction and Administration Agreement, entered into as of December 30, 2020 (inclusive of all amendments, exhibits, and addenda thereto, the "FCAA");

b. That certain Land Development Agreement, entered into on December 30, 2020, and effective as of December 13, 2020 (inclusive of all amendments, exhibits, and addenda thereto, the "LDA"); and

c. That certain Dedication Agreement, entered into as of December 30, 2020 (inclusive of all amendments, exhibits, and addenda thereto, the "DA").

7. The Debtor is also a an express third-party beneficiary under that certain Interlocal Agreement, entered into as of April 17, 2020 by and between the City and York County, South Carolina (inclusive of all amendments, exhibits, and addenda thereto, the "ILA, and together with the FCAA, the LDA, and the DA, the "Project Documents").

8. Pursuant to the FCAA, the City funded the City Infrastructure Funding Amount of $20 million into the City Infrastructure Funding Account (as each such term is defined in the FCAA) on or about January 6, 2021, which amounts GTRE was required to use to fund Bonded Infrastructure Improvements (as such term is defined in the FCAA).[6]

9. Further, prior to the Petition Date, GTRE failed to perform and otherwise breached one or more of the Project Documents, including, but not limited to, GTRE's failure to perform under sections 4.1, 8.2, 12.6, and 12.12 of the FCAA. On April 29, 2022, pursuant to section 11.1 of the FCAA, the City delivered a formal notice of default to GTRE, triggering the contractual cure period. GTRE did not cure its defaults as prescribed in the FCAA.

10. Notwithstanding the City's performance of its obligations under the Project Documents and GTRE's numerous defaults under same, GTRE issued a notice of default to the City on March 18, 2022, followed by GTRE's delivery to the City of a notice of special termination

[6] On information and belief, the City is one of the largest, if not the largest, creditor of the Debtor's bankruptcy estate.

of the LDA and a notice of rescission of the FCAA on April 19, 2022 (together, the "Notices"). The City disputes all of GTRE's allegations of default, as well as the effectiveness, validity, and enforceability of the Notices.

## OBJECTION

### I. The Debtor Has Not Demonstrated That the DIP Facility Satisfies the "Entire Fairness" Test

11. Debtor-in-possession facilities offered by insiders are subject to "rigorous scrutiny," and a debtor, seeking approval of an insider debtor-in-possession facility must satisfy the "entire fairness" test, which consists of two elements: (a) fair dealing; and (b) fair price. *In re LATAM*, 620 B.R. 722, 769, 771 (Bankr. S.D.N.Y. 2020) (citing *Carlson v. Hallinan*, 925 A.2d 506, 531 (Del. Ch. 2006)). A debtor seeking approval of an insider debtor-in-possession facility bears the burden of demonstrating that the debtor-in-possession facility in question satisfy the entire fairness test. *Id.* at 769. "Fair dealing focuses on the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation." *Id.* at 773-74 (quoting *Carlson*, 925 A.2d at 531). "[D]ue care is directly relevant" to the fair dealing analysis and "can be established by evidence of careful consideration and process, including but not limited to, financial analyses, independent advice and careful deliberation." *Id.* at 774 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172-76 (Del. 1995)). Fair price can be shown where "the pricing has been subjected to a thorough marketing test and there are no other proposed transactions that will enable the Debtors to obtain financing on better terms consistent with its liquidity needs." *Id.* at 791.

12. Here, the Motion is devoid of any mention of the heightened standard applicable to an insider debtor-in-possession facility. Instead, the Debtor argues that the DIP Facility should be

approved because it "is a sound exercise of the Debtor's business judgment,"[7] a well-known but inapplicable standard here. Instead, the Debtor must establish that the DIP Facility satisfies the "entire fairness" standard, which it cannot. Indeed, the structure of the DIP Facility, and the protections afforded to the DIP Lender and other insiders of the Debtor, are indicative of a transaction that – while perhaps imminently "fair" to the Debtor's affiliates and equity holders – is inherently and equally unfair to the rest of the Debtor's stakeholders, especially unsecured creditors.

13. In addition, despite touting in the A&M Declaration that the DIP Facility was vetted and approved by the Debtor's two independent managers, neither of the two independent managers[8] who supposedly shielded the Debtor from undue influence by its direct Parent and DIP Lender offered a declaration or affidavit in support of the proposed insider DIP Facility. Accordingly, for the reasons set forth below, the DIP Facility does not satisfy the entire fairness standard and should not be approved by the Court.

### *A. The DIP Facility is Unnecessary for the Debtor's Asserted "Bare Bones" Strategy for This Case*

14. As a threshold matter, it is unclear why the DIP Facility is needed at all, or at least in the amount and on the timeline reflected in the budget. According to the Debtor, the "chapter 11 strategy" employed by its Chief Restructuring Officer and Debtor's counsel with respect to this Case is to protect the Debtor's assets and bring about an orderly wind down of the Project, address the liabilities of the Debtor, and preserve the Debtor's assets while resolving legitimate claims. *See* A&M Declaration, ¶ 7. Given these self-confessed goals, it is unclear why the Debtor chose a Chapter 11 (*i.e.,* "reorganization") over a Chapter 7 (*i.e.,* "liquidation") proceeding in the first

[7] Motion, at ¶ 19.

[8] Upon information and belief, the two independent managers were put in place two weeks prior to the Petition Date.

place. However, as described in more detail below, the DIP Facility provides clues to the answer to that question, namely that the Debtor is using the Case, the DIP Facility, and in short order, its chapter 11 plan,[9] to improperly eliminate all liabilities and obligations of the Parent and all of its undisclosed affiliates and subsidiaries to enhance the legal rights and financial position of its affiliates and insiders. Such goals are antithetical to the entire fairness standard. Accordingly, the Debtor has failed to meet its burden and the Motion should be denied.

### ***B. The DIP Facility Seeks to Improperly Enhance the Collateral Package of the DIP Lender, an Insider, at the Expense of Unsecured Creditors***

15. Given the incongruity between the Debtor's goals and case strategy and the purported need for the DIP Financing as proposed, it is obvious that the party who demonstrably stands to benefit from the relief sought in the Motion is the Parent and its unknown affiliates and subsidiaries through the enhancement of its pre-petition collateral package and the grant of broad releases. But courts should not approve proposed financing "where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate." *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) (citing *In re Crouse Grp.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987)). Here, however, the DIP Lender's collateral package is enhanced through both the Roll-Up DIP Facility and the liens granted to the DIP Lender on the proceeds of avoidance actions.

i. <u>The Insider Roll-Up Is Improper</u>

16. The DIP Facility, through the Roll-Up DIP Facility and Roll-Up DIP Loan, provides for a roll-up of approximately $3.2 million in pre-petition debt owed to the DIP Lender by the Debtor, secured by the Debtor's membership interests in and property owned by certain

---

[9] Pursuant to the DIP Credit Agreement (as defined below), the Debtor must file with the Court a chapter 11 plan acceptable to the DIP Lender by July 31, 2022. *See* DIP Credit Agreement, § 5(b).

non-debtor affiliates. The DIP Facility (including the Roll-Up DIP Facility), in turn, is secured by all real and personal property of the Debtor, including previously unencumbered assets of the Debtor. *See* First Day Declaration ¶ 26; DIP Order ¶ 2(d).

17. Roll-ups are generally disfavored because they provide little or no economic benefit to a debtor and solely benefit prepetition lenders by circumventing the priorities and distribution framework of the Bankruptcy Code. *See, e.g.*, *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (stating that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Vill. Co.*, 104 B.R. 562, 570 (Bankr. D.N.H. 1989) (holding that section 364 does not authorize the granting of administrative expense priority for prepetition debt); *see also*, Dec. 3, 2008 Hr'g Tr. at 32:20- 25, *In re Verasun Energy Corp.*, No. 08-12606 (BLS), (Bankr. D. Del. Dec. 3, 2008) [ECF No. 316] (noting that the Bankruptcy Courts for the District of Delaware and the Southern District of New York and other courts have found that "roll-ups are not favored. They are strongly discouraged on day one, and the bottom line is that for approval a substantial showing [of need for the financing] has to be made").

18. Here, the DIP Lender and Debtor have failed to make the required "substantial showing" of why the DIP Facility is necessary generally and why the Roll-Up DIP Facility is warranted specifically. In addition, it is impossible to accurately ascertain the true ramifications of the value of the Roll-Up DIP Facility because the Debtor has not provided the Court or parties in interest with copies of the pre-petition loan documents, nor has it disclosed the value of the collateral securing those notes, which very well may be over-secured. The lack of such information should not require the Court, creditors, and other parties in interest to close their eyes

and cross their fingers; it should preclude approval of the Motion until such information is disclosed.

ii. Liens on Proceeds of Avoidance Actions Are Improper

19. The DIP Facility provides the DIP Lender with a lien on the proceeds[10] of the Debtor's avoidance actions. *See* DIP Order, ¶ 2(d). The Debtor admits that it has "limited unencumbered assets." *See* A&M Declaration ¶ 15. The DIP Facility, as proposed, would then take what may be one of the Debtor's most valuable and crucial unencumbered assets – the proceeds of avoidance actions – away from the grasp of unsecured creditors.

20. Having a lien on the proceeds of avoidance actions would constitute an improper windfall for the DIP Lender at the expense of the Debtor's unsecured creditors. Indeed, numerous courts have refused to grant liens on avoidance actions. *See, e.g.*, Sept. 2, 2010 Hr'g Tr. 14:22-15:4, *In re Innkeepers USA Trust*, No. 10-13800 (SCC), (Bankr. S.D.N.Y. Sept. 2, 2010) [ECF No. 433] ("Regarding the committee's objection to the granting of superpriority claims with respect to avoidance actions or the proceeds thereof, I agree with the committee's position and decline to grant the superpriority claims."); *In re Adams*, 275 B.R. 274, 283 (Bankr. N.D. Ill. 2002) ("[T]he grant of a superpriority claim to a prepetition secured creditor violates the Code's policy of equality of distribution, particularly where there is no showing that such a grant will benefit the debtors' bankruptcy estate."); *see also Majestic Star Casino, LLC v. Barden Dev., Inc. (In re the Majestic Star Casino, LLC)*, 716 F.3d 736, 761 n.26 (3d Cir. 2013) ("A debtor is not entitled to

[10] In a calculated move to increase its chances of obtaining approval of the DIP Facility, the DIP Lender is not seeking a lien on the Avoidance Actions themselves, but the proceeds thereof. Had the DIP Lender sought and obtained a lien on Avoidance Actions, it would have faced strident arguments that it was seeking to eliminate, for example, a potential claw back action with respect to the Debtor's Prepetition Insider Transfer (as defined below). *See, infra*, n.13. Regardless, granting the Parent a lien on Avoidance Actions is tantamount to granting liens on the Avoidance Actions themselves, because even if the Debtor sought to avoid prepetition transfers to its Parent, subsidiaries, or affiliates, the funds recovered would likely make a round trip back to such Parent, subsidiaries, or affiliates.

benefit from any avoidance . . . and 'courts have limited a debtor's exercise of avoidance powers to circumstances in which such actions would in fact benefit the creditors, not the debtors themselves'") (quoting *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000)); *Buncher v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away. When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (citations omitted); *McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 33 (N.D.N.Y. 1997), *aff'd*, 142 F.3d 571 (2d Cir. 1998) ("the Code allows only the trustee or debtor-in-possession to sue on a preference because only that trustee or debtor-in-possession represents the interests of all creditors in maximizing the value of the debtor's estate") (citations omitted).

21. As the cited cases reflect, the fact that only proceeds of Avoidance Actions – as opposed to the actions themselves – would be encumbered should make no difference. Either one has the same improper effect of (i) awarding secured creditors the value of claims that are not their collateral outside bankruptcy, and (ii) transforming assets that are created by law for the benefit of unsecured creditors as a class into the asset of a specific creditor or creditors. For this reason, the Motion should not be approved.

### *C. The Releases Are Overly-Broad and Information is Too Scarce to Properly Ascertain Their True Ramifications*

22. Similar to the problems attendant to the Roll-Up DIP Facility, where it is impossible to ascertain the potential reach and ramification of the provision due to a lack of applicable

information, there is no way that creditors and other parties in interest can accurately determine the effect of the releases contained in the DIP Order.

23. More specifically, the Debtor offers a "simple organizational chart depicting the ownership of the Debtor" in the First Day Declaration, which depicts the Debtor's non-debtor direct and indirect parent entities, as well as two non-debtor subsidiaries. *See* First Day Declaration, ¶ 25.




24. This simple organizational chart fails to depict the full extent of the parties the Debtor is seeking to release under the Final DIP Order.[11] Through the Motion, the Debtor seeks the following releases under the proposed final order approving the DIP Facility.

> Subject to entry of a Final Order, the Debtor forever and irrevocably releases, discharges, and acquits (a) the DIP Lender, (b) the Prepetition Secured Lender, (c) **Affiliates of the DIP Lender**, and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, and predecessors and successors in interest of the DIP Lender and its Affiliates (collectively, the "***Releasees***") of and from any and all claims, demands,

[11] The City requested a full organization chart, but the Debtor has failed to produce one to date.

> liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, **<u>of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition Debt Documents relating to the Subsequent Prepetition Secured Note and/or the transactions contemplated hereunder or thereunder including</u>**, without limitation, (x) any so-called lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims held by the Prepetition Secured Lender and DIP Lender. **<u>Also subject to entry of a Final Order, the Debtor further waives and releases any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Note and the DIP Obligations which the Debtor now has or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of the Final Order</u>**.

Interim DIP Order, ¶ E(x) (emphasis added).

25. The DIP Credit Agreement[12] defines the term "Affiliate" as having the

> meaning set forth in Section 101(2) of the Bankruptcy Code **<u>and also includes any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person</u>**. For the purposes of this definition, the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

DIP Credit Agreement, § 1 (emphasis added).

26. The definition of "Affiliate" under the DIP Credit Agreement goes well beyond the statutory definition under the Bankruptcy Code and seeks releases in favor of unknown entities,

[12] The term "<u>DIP Credit Agreement</u>" refers to that certain *Debtor-in-Possession Credit Agreement*, dated as of June [6], 2022, between GT Real Estate Holdings, LLC, as Borrower, and DT Sports Holding, LLC, as Lender, which is attached to the Motion as Exhibit B.

and, consequently, unknown claims, causes of action, and other labilities. The potential windfall for the Releasees here is clear. Given that the DIP Lender is also the parent of the Debtor, the releases arguably include every entity in the Debtor's organizational chart, including equity and numerous entities with whom which significant pre-petition transactions were conducted.[13] And while the releases ostensibly are cabined by a causal connection to the DIP Facility, a closer reading suggests otherwise. In fact, the releases only need to be connected to the DIP Facility, the DIP Documents, the Prepetition Debt Documents, the Subsequent Prepetition Secured Note, *and/or transactions contemplated thereunder*. *See* DIP Order, ¶ E(x) (emphasis added).

27. The potential list of transactions contemplated under such myriad documents is, at best, a fact issue that could bog down any potential litigation with expensive and time-consuming discovery. At worst, it could preclude any such litigation outright. Creditors and other parties in interest should not be held hostage by such constraints at such an early stage in this Case. Any such releases, if appropriate at all, would only be appropriate if vetted through a plan confirmation process, not one month into the Case with respect to financing, the need for which is suspect in the first place. For these reasons, the Motion should be denied.

### ***D. The DIP Lender Benefits from Administration of Workers' Trust Escrow Account at the Expense of the Estate***

28. The City further objects to the Motion to the extent the Debtor is required to administer the Worker's Trust Escrow Account for, apparently, no compensation or consideration. While the City does not object to the payments made to the Workers' Trust Beneficiaries

[13] For example, on April 12, 2022, the Debtor sold a parking lot adjacent to Bank of America Stadium in Charlotte (home to the NFL Panthers) to PS Marks LLC, an affiliate, for $15.5 million—the exact price the Debtor paid for the parcel originally (the "Prepetition Insider Transfer"). *See* First Day Declaration, ¶36. When the parcel was originally purchased, its fair market value, and what effect such period of time has had on real estate in Charlotte, one of the United States' fastest growing cities, is unclear. *See Fastest-Growing Places in the U.S. in 2022-2023*, U.S. NEWS, https://realestate.usnews.com/places/rankings/fastest-growing-places (last visited June 21, 2022).

contemplated under the DIP Credit Agreement, it does not necessarily agree with the Debtor that the Debtor's role in administering payments under the Workers' Trust Escrow Arrangement "involves no meaningful expenditure of estate resources." *See* Motion, ¶ 33.

29. It is the DIP Lender, not the Debtor, that is requiring the inclusion of the Workers' Trust Escrow Arrangement in the DIP Facility. *Id.*, ¶ 34. Certainly, a third-party administrator would charge for such services, but the Debtor acknowledges that it is "best situated" to administer the program and has the expertise and historical knowledge necessary to do so. *Id.*, ¶ 36.

30. The DIP Lender should not have it both ways here. If it is requiring that the Debtor administer the Workers' Trust Escrow Arrangement, it should pay for such services, such as through a servicing fee or a reduction in, or elimination of, the interest rate the Parent is charging under the DIP Facility. Requiring the Debtor to provide these services at no cost is further indicative of lack of fairness inherent in the DIP Facility, and the Motion should be denied.

## II. Certain Modifications to the Final DIP Order Are Appropriate

31. To the extent that the Court is inclined to grant the Motion and approve the DIP Facility, the City requests that it do so only after the Final DIP Order has been modified as set forth below to ensure that the DIP Facility, as approved, is fair and reasonable and does not unduly prejudice the Debtor's unsecured creditors and other parties in interest.

| **Term** | **Necessary Revision(s) to Final DIP Order** |
|---|---|
| **Challenges (DIP Order ¶¶ E(iv)-(v))** | The Debtor is a limited liability company organized under the laws of the State of Delaware. With respect to any Challenge brought by a third party, including the City, this raises an issue under the holding of the Delaware Supreme Court in *CML V, LLC v. Bax*, 28 A.3d 1037 (Del. 2011). Under *Bax*, "[o]nly members or assignees of LLC interests have derivative standing to sue on behalf of an LLC – creditors do not." 28 A.3d at 1043. The Delaware Supreme Court based its holding on two provisions of the Delaware LLC Act, which provide that the "[p]roper plaintiff" in "an |

| | |
|---|---|
| | action . . . in the right of a limited liability company to recover a judgment in its favor . . . must be a member or an assignee of limited liability company interest at the time of bringing the action." 6 Del. Code §§ 18-1001, 18-1002. *Bax* has created a conundrum in the bankruptcy context, where lender releases routinely are granted with no creditors (other than those who will benefit from the releases) in the room. *See, e.g.*, *In re Furie Operating Alaska, LLC, et al.*, No. 19-11781 (LSS) (Bankr. D. Del. Dec. 27, 2019) [ECF No. 442] (letter from Court to counsel outlining issues related to *Bax*). The City assumes that neither the Debtor nor the DIP Lender intends for the Challenge Period and any lawsuit or contested matter stemming therefrom or in connection therewith to be illusory.<br><br>As such, the Final DIP Order should include a stipulation and agreement from the DIP Lender and Prepetition Lender that the City specifically has standing to initiate an adversary proceeding or contested matter brought in connection with the Prepetition Liens, Prepetition Secured Notes, DIP Liens or DIP Obligations and that neither of them will raise as a defense in connection with any such challenge or adversary proceeding or contested matter the ability of creditors to file derivative suits on behalf of the Debtor.<br><br>Moreover, the Final DIP Order should impose an appropriate deadline on the Debtor to amend its limited liability agreement to permit a challenge or any adversary proceeding or contested matter against the DIP Lender and Prepetition Lender to be commenced by the City. |
| **Avoidance Actions Challenges (DIP Order ¶¶ E(iv)-(v))** | The Final DIP Order should explicitly exclude proceeds of Avoidance Actions from the definition of DIP Collateral. |
| **Releases (DIP Order ¶¶ E(x))** | The scope of releases provided to the Releasees should be amended to make it clear that such releases extend only to claims arising out of, in connection with or relating to the DIP Facility and the DIP Documents, and do not extend to Affiliates of the Debtor with respect to any other pre-petition transactions. |
| **Information** | The Final DIP Order should provide a time certain by which the Debtor must provide parties in interest with copies of (i) the Prepetition Secured Notes and related loan documents |

| | |
|---|---|
| | and (ii) a fulsome organizational chart showing all of the Debtor's Affiliates as defined in the DIP Credit Agreement. To the extent the Court is inclined to approve the releases set forth under the Final DIP Order, as proposed, the Debtor must provide a fulsome organizational chart as part of the evidentiary record at the Final Hearing. |

## RESERVATION OF RIGHTS

32. Nothing in this Objection should be construed as a waiver by the City of any claims, causes of action, or rights that is has under the Project Documents or any other applicable law, and all rights related thereto are reserved. The City further reserves the right to further object to the Motion and any other ancillary issues on any grounds and to respond to any reply of the Debtor, the proposed DIP Lender, the Prepetition Secured Parties, or any other party in interest, either by further submission to this Court, at oral argument or by testimony to be presented at the Final Hearing or any other hearing.

## NOTICE

33. The City will provide notice of this Objection to the following parties: (i) the Debtor; (ii) the proposed DIP Lender; (iii) the U.S. Trustee; (iv) the Construction Manager; (v) the United States Attorney for the District of Delaware; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; (viii) the County; (ix) the South Carolina Department of Revenue; (x) the Insurance Carriers on the Schedule of Insurance Policies; (xi) all applicable banks and other financial institutions; and (xii) any other party requesting notice pursuant to Bankruptcy Rule 2002. The City submits that such notice is sufficient and no other or further notice need be provided.

**CONCLUSION**

WHEREFORE, the City respectfully requests that this Court sustain the Objection and deny the relief requested in the Motion on a final basis. In the alternative, the City respectfully requests that the objections raised herein be addressed and incorporated into a revised proposed final order that is acceptable to the City. The City further requests that the Court grant such other and further relief as the Court deems just and proper.

Dated: June 22, 2022
Wilmington, Delaware

Respectfully submitted,

*/s/ Maris J. Kandestin*

Maris J. Kandestin (Del. Bar No. 5294)
MCDERMOTT WILL & EMERY LLP
The Nemours Building
1007 North Orange Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 485-3900
Fax: (302) 351-8711
E-mail: mkandestin@mwe.com

and

Charles R. Gibbs (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 295-8000
Fax: (972) 232-3098
E-mail: crgibbs@mwe.com

*Counsel to City of Rock Hill, South Carolina*