**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GT REAL ESTATE HOLDINGS, LLC, | Case No. 22-10505 (KBO) |
| Debtor. | **Related to D.I. No. 9** |

**OBJECTION OF MASCARO/BARTON MALOW, A JOINT VENTURE, TO DEBTOR'S
MOTION FOR ENTRY OF A FINAL ORDER (I) AUTHORIZING THE DEBTOR TO
OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-
PRIORITY CLAIMS, (III) MODIFYING THE AUTOMATIC STAY, (IV)
SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Mascaro/Barton Malow, a Joint Venture ("MBM"), by and through its undersigned

counsel, submits its Objection to entry of a final order (the "Proposed Final DIP Order") on the

*Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain*

*Postpetition Financing, (II) Granting Liens and Super-Priority Claims, (III) Modifying the*

*Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP

Financing Motion") [D.I. No. 9] and respectfully states as follows:

## I.    PRELIMINARY STATEMENT

1.    Based on the extraordinary facts and circumstances surrounding this case, the Court

should deny the relief sought in the DIP Financing Motion and should require that any funds

advanced to date be reserved for only those uses necessary to secure and preserve the Project[1]

while case alternatives are explored, including the possible appointment of a chapter 11 trustee or

even conversion.  In addition to the infirmities that pervade the Proposed Final DIP Order and DIP

Financing Agreement (which are discussed *infra*), the overwhelming number of insider

---

[1] Capitalized terms in this Preliminary Statement have the meaning ascribed to them in the balance of the Objection.

transactions, coupled with the extent of David Tepper's control and influence in this Case, amplify the already heightened scrutiny that is required when considering an insider DIP facility.  While MBM has not had the opportunity to conduct any discovery, based on the Debtor's pleadings and declarations of record, information available in the public domain, and information in MBM's possession, MBM submits that entities owned or controlled by David Tepper ("Tepper"), and in particular the Carolina Panthers, may be liable for the Debtor's obligations, which of course goes to the propriety of many of the terms in the Proposed Final DIP Order.  A brief summary is illuminating:

(a) The Debtor[2] identifies itself as a Delaware LLC that is wholly owned by insider DT Sports Holding, LLC.  However, the Debtor's public filings with the State of North Carolina create a different perception.

    i. As recently as April 20, 2022 (42 days prior to the Petition Date), the Debtor filed with North Carolina its Limited Liability Company Annual Report wherein it identifies Tepper (and only Tepper) as a member of the Debtor.  See Exhibit A.  No reference is made to DT Sports Holding, LLC.  The annual reports for 2021 and 2020 reflect the same. See Exhibit B.

    ii. The Debtor's formation documents filed in Delaware are also revealing.  See Exhibit C.  The formation documents were signed by Jeffrey Kaplan. Based on Mr. Kaplan's LinkedIn page and publicly available information (www.xlr8ac.com/jeffery-kaplan), Mr. Kaplan was the Chief Operating Officer of Appaloosa Management at the time he signed the Debtor's formation documents.  Appaloosa Management, L.P., is a hedge fund founded and controlled by Tepper.

    iii. Continuing the theme, the Debtor's telephone number identified in numerous filings with various states is owned by the Carolina Panthers.

(b) The Debtor's address is 800 S. Mint St, Charlotte, NC 28202, which is commonly known as Bank of America Stadium, the home of the Carolina Panthers.

(c) The Debtor has no employees.  Having no employees, communications and directives relating to the Project have solely come from representatives of the Carolina Panthers and more recently other entities controlled by Tepper.

---

[2] The Debtor was formally eponymously named DT Real Estate Holdco, LLC.

(d)     The Debtor's Contract with MBM was signed by "Mark Hart" as "Vice President and C.O.O."  MBM does not believe Mark Hart is the Vice President and C.O.O. for the Debtor.  Mr. Hart's title with the Carolina Panthers, however, is Vice President and Chief Operating Officer.  All communications between MBM relating to the Project have been with Mr. Hart, other representatives of the Carolina Panthers, or other entities controlled by Tepper.

(e)     The Debtor has at all times been undercapitalized, as evidenced by the fact that the Carolina Panthers made approximately $163.5 million in payments associated with the Project, **of which $115,422,770 was paid directly to MBM by the Carolina Panthers from its own checking account**. See <u>Exhibit D</u>.  These payments have been generally referenced by the Debtor as purported "loans," but curiously there is no reference to loan documents in any of the Debtor's pleadings or related declarations.  Upon information and belief, the Carolina Panthers' "loans" are undocumented.

(f)     The Debtor has retained the law firm of White & Case as its counsel.  While no retention application has been filed to date, White & Case was counsel for Appaloosa Management, L.P. in *In re Delphi Corporation* in connection with a complaint filed against Appaloosa Management and others alleging, among other things, fraud.  *In re Delphi Corp. v. Appaloosa Management, L.P.*, 2008 WL 3486615.  See <u>Exhibit E</u>.

(g)     The Debtor has stated that it recently appointed a two-member "independent board." One of the two board members is Lawrence Rolnick.  Coincidentally, based on a review of the public record there is a lawyer named Lawrence Rolnick who represents or formerly represented Appaloosa Management, L.P. See <u>Exhibit F</u>.

(h)     The Debtor has described its disputes with the City of Rock Hill, South Carolina, at length in most of its filings in this Case.  Per the First Day Declaration, on March 18, 2022 the Debtor/Carolina Panthers issued a notice of default to the City under the FCAA, which triggered a 30-day cure period.  Between the time the Debtor issued a notice of default under the FCAA and the cure date, the Debtor sold a valuable parking facility adjacent to the existing Carolina Panthers football stadium to yet another insider for $15.5 million, which the Debtor describes as "the same price the Debtor paid for it previously."  No further information relating to the Debtor's original acquisition of the lot was disclosed, such as the date of the original acquisition, the  condition of the property at that time, or other information germane to value.  The public record shows that the Carolina Panthers Stadium opened in 1996 - 26 years ago.

(i)     The Debtor references two documented insider prepetition loans (the "Prepetition Insider Loans") that occurred days before the Petition Date – (i) the issuance of a $4 million amended and restated secured promissory note (dated May 26, 2022) and (ii) a $3.2 million secured promissory note (dated May 31, 2022).  In striking contrast to the past practice of funding the Project with undocumented "loans" from the Carolina Panthers since the inception of the Project, these advances were memorialized with secured notes and collateralized with the Waterford Golf Club (which value has not been disclosed).[3]  Notably, during this same week and at all times during the Debtor's dispute with the City, representatives of the Carolina Panthers continued to direct MBM to provide materials and services under the Contract.

(j)     DT Sports Holding, LLC[4] is the Insider Lender/Owner and holder of the Prepetition Insider Loans.  The Proposed Final DIP Order and the DIP financing documents heavily benefit other insiders of the Debtor (under, among other things, the expansive definitions of "Releasees" and "Affiliates," the latter of which goes far beyond the definition of Section 101(2) of the Bankruptcy Code) and likewise restricts the ability of third parties to investigate, challenge and prosecute claims against insiders.

The above list is by no means exhaustive, but highlights the pervasive non-debtor control and intermingling of business activity that lays the foundation for this Case.  *This Case is structured to preserve Tepper's control with no market-testing or interference so the Tepper-controlled parties can remedy the confused prepetition intermingling of affairs by and among the Carolina Panthers, other Tepper-controlled entities, and the continuously undercapitalized Debtor.*  The proposed DIP financing is the impetus of that improper goal, which should not be countenanced.  Despite the requirements of the Bankruptcy Code, the DIP financing was not marketed prepetition to alternative lenders under the guise of protecting the Project's contractors (who comprise the vast majority of non-insider creditors in this Case) via the grant of junior DIP liens; but such "protection" is illusory.  Even with the Secured Trade Obligations having priority over the DIP

---

[3] The DIP Financing Motion defines the DIP Credit Agreement as that certain secured superpriority Debtor -in-Possession Credit and Guaranty Agreement by and between the Debtor as borrower … and the Insider Lender/Owner… . However, no guaranty agreement is attached to the DIP Financing Motion.

[4] DT Sports Holding, LLC is formerly known as DT Panthers Holding, LLC.

Liens, collateral value and the corresponding treatment of those claims would still be dictated by Tepper – not the market – per the terms of the DIP Financing Facility.  The insider-dictated Milestones require the filing of a chapter 11 plan in a month – not a sale process that could potentially establish a value of the mechanics lienholders' collateral through a fair and open process.  That plan must be "acceptable" to the insider, which translates to plan funding "acceptable" to Tepper as well as his inevitable imposition of broad third-party releases.  Whatever value is to be allocated to "legitimate" (as that term has been repeatedly used by the Debtor) contractor claims/mechanic's lien holders will be dictated by the very insider enterprise that has refused to pay them in the first place.  This Case was filed to purportedly wind down the Project, conduct a claims reconciliation process and pay something to the creditors (the "Wind Down") – tasks that could easily be achieved in a chapter 7 – but instead we find ourselves in a chapter 11 with an insider angling for releases and waivers that will insulate Tepper's entire enterprise, and most notably the Carolina Panthers.  The DIP financing (like the Debtor itself) is a fictional façade, which, if approved, will effectively sanction the injustice and unfairness suffered by "legitimate" creditors to date.  No further relief should be granted in connection with the DIP Financing Motion, with the notable exception of the funding of those amounts promised to the displaced workers per the Interim DIP Order – who, not surprisingly, have yet to be paid as promised.

## II.    **BACKGROUND**

### A.    **The Bankruptcy Case and Petition Date.**

2.      On June 1, 2022 (the "Petition Date"), GT Real Estate Holdings, LLC (the "Debtor")[5] commenced the above-captioned bankruptcy case (the "Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

---

[5] The Debtor was formerly known as DT Real Estate HoldCo., LLC.

3.      No trustee or examiner has been appointed in this Case. The Office of the United States Trustee (the "United States Trustee") has not formed an official committee of unsecured creditors.

**B.      The Prepetition Debtor and Insiders.**

4.      The Debtor is a Delaware limited liability company that is purportedly "wholly owned by DT Sports Holding, LLC" (the "Insider Lender/Owner").  *First Day Dec.,* D.I. 8, ¶ 24. Notwithstanding the foregoing, available public records suggest that Tepper may have been a member of the Debtor as recently as April 20, 2022.[6]  See *Limited Liability Company Annual Reports for North Carolina*, Exhibit A.

5.      Other public documents suggest Appaloosa Management, L.P. may be involved with the Debtor, as the Debtor's formation documents with the State of Delaware Secretary of State Division of Corporations, as well as public filings in other states, were signed by Jeffrey Kaplan. *See Certificate of Formation*, Exhibit C. Based on Mr. Kaplan's LinkedIn page and his biography for Accelerate Acquisition Corp. (www.xlr8ac.com/jeffery-kaplan), Mr. Kaplan was the Chief Operating Officer of Appaloosa Management when the Debtor was formed and the Project was launched.  Appaloosa Management, L.P., is a hedge fund founded and controlled by Tepper.

6.      The Debtor is an entity purportedly created to own and develop a 234-acre sports and entertainment venue in Rock Hill, South Carolina (the "City"), the primary purpose of which was to provide a new headquarters and practice facility (the "Practice Facility/HQ") for Panthers Football, LLC.  Panthers Football, LLC is more commonly known as the Carolina Panthers NFL

---

[6] MBM does not have a complete set of the Debtor's formation documents, including, all amendments thereto. These filings, coupled with the balance of facts surrounding this Case, are germane.

football team (the "Carolina Panthers").  *See Declaration of Jonathan Hickman, Chief Restructuring Office of the Debtor, In Support of the Chapter 11 Petition and First Day Pleadings* (the "First Day Dec."*)*, D.I. 8, ¶¶6, 24-25.  The Insider Lender/Owner also directly or indirectly owns the Carolina Panthers.  D.I. 8, ¶ 24.

7.      The Debtor, in turn, is the parent of two subsidiaries, Waterford Golf Club, LLC, Waterford Golf Club 1, LLC, which collectively own and operate the Waterford Golf Course. *First Day Dec.,* D.I. 8, ¶ 24.

8.      The Debtor's address is 800 S. Mint St, Charlotte, NC 28202, which is commonly known as Bank of America Stadium ("Panthers Stadium").  Other Affiliates[7] who share the Panthers Stadium address include, without limitation, the Insider Lender/Owner, the Carolina Panthers, Waterford Golf Club, LLC, and Waterford Golf Club 1, LLC.  The Debtor's telephone number is likewise owned by the Carolina Panthers.

9.      The Debtor has no employees.  *First Day Dec.,* D.I. 8, ¶ 24.  Further, upon information and belief, the Debtor[8] has never had any employees or, until very recently, a management team.  The limited business of the Debtor has been conducted by representatives of the Carolina Panthers, including, without limitation, Mark Hart, the Vice President and Chief Operating Officer of the Carolina Panthers.  At all times relevant to the development of the Project, Project-related communications have come from/through Mr. Hart, other representatives of the Carolina Panthers, or other entities controlled by Tepper.

---

[7] Capitalized terms not defined in this Objection have the meanings ascribed to them in the DIP Financing Motion or the DIP Credit Agreement attached to the DIP Financing Motion.

[8] The purported Debtor entity is believed to be so intertwined with the Carolina Panthers and other of its Affiliates that no reference to the Debtor herein should be construed as an admission by MBM or joining creditors that the Debtor is, in fact, a separate entity from the Carolina Panthers or any other of their Affiliates, and all rights with respect to claims/actions sounding in veil piercing, alter ego, amalgamation, and single enterprise theory as well as substantive consolidation are expressly reserved.

10.     A few days before the Petition Date, the Debtor formed what it characterizes as a two-member "independent board." D.I. 8, ¶ 38, FN. 13. While the Debtor's CRO states that the two managers "have no affiliation with the Debtor or any of its affiliates," one of the two board members is Lawrence Rolnick.  Bankruptcy Petition, D.I. 1, p. 10.  It appears that Lawrence Rolnick is a lawyer who represents or formerly represented Appaloosa Management, L.P. *See* www.rksllp.com/profile/lawrence-rolnick; *see also* SEC filing Exhibit F.

11.     At all times relevant hereto, Tepper has controlled the Debtor and its Affiliates, whose affairs have been actually and apparently intertwined throughout the prepetition period.

**C.     The Practice Facility/HQ Project.**

12.     In order to construct its new Practice Facility/HQ, the Carolina Panthers, by and through the Debtor, entered into that certain Construction Management Agreement dated March 30, 2020 (the "Contract").

13.     The Contract was executed on behalf of the shell Debtor with a signature by "Mark Hart" as "Vice President and C.O.O."   However, it appears the Debtor did not have a Vice President or C.O.O. at the time of Contract execution.  As noted above, Mark Hart serves as the Vice   President   and   Chief   Operating   Officer   of   the   Carolina   Panthers.   *See* www.panthers.com/team/front-office-roster.

14.     Pursuant to the Contract, MBM, as Construction Manager/General Contractor, among other things, manages and provides general contracting and other services with respect to construction of the Carolina Panthers' new Practice Facility/HQ (the "Project").

15.     MBM, as Construction Manager/General Contractor, provided materials and labor to the Project both directly, and by engaging 68+ first-tier subcontractors (who, in many cases, engaged second-tier subcontractors).  In addition to its responsibilities for the overall project price,

completion, delivery and schedule, MBM directly performed, *inter alia*, the following: temporary enclosures, temporary stairs and handrails, site fencing, daily clean-up, water removal, site survey including the floor surveys during construction, daily supervision, and daily adherence to the plans and specifications of all work. MBM was also required to perform the general conditions (as set forth and described in the Contract). Preconstruction mobilization commenced at the Project on July 13, 2020. Development of the Project commenced on July 20, 2020 (the "Project Start Date").

16.     MBM and the 68+ first-tier subcontractors and additional second-tier subcontractors performed as required under the Contract at all times relevant hereto. Until the Petition Date, applications for payment were consistently reviewed by the Project architect and ultimately approved by Mark Hart and/or some other Carolina Panthers representative of an Affiliate.

17.     Since the Project Start Date, the Carolina Panthers funded the under-capitalized Debtor approximately $163.5 million for the costs associated with the Project, purportedly on an unsecured basis. *See First Day Dec.,* D.I. 8, ¶ 26. Of that amount, the Carolina Panthers directly paid MBM $115,422,770 for amounts due per the Contract. True and correct copies of payment checks (account numbers redacted) received from the Carolina Panthers are attached hereto as Exhibit D. Curiously, no reference to loan documentation relating to these advances is referenced in the Debtor's filings.

18.     The Debtor/Carolina Panthers suspended work at the Project on March 7, 2022, following disputes with the local government. The disputes were heavily publicized pre-bankruptcy and described in the Debtor's filings as being attributable to the City and its purported refusal to issue $225 million in public bonds. *See First Day Dec.,* D.I. 8, ¶ 29. Notably, the Debtor

and/or Carolina Panthers authorized the Guaranteed Maximum Price for the Contract in the summer of 2021, after the initial deadline for the issuance of $225 Million in public bonds.

19.     On March 18, 2022, the Debtor/Carolina Panthers issued a notice of default to the City under the Finance and Construction Administration Agreement (the "FCAA"), which triggered a 30-day cure period.  On April 19, 2022, the Debtor provided a notice of special termination of the Land Development Agreement (the "LDA") and a notice of rescission of the FCAA. *First Day Dec.,* D.I. 8, ¶ 33.  The City disputes the bases for such actions. *First Day Dec.,* D.I. 8, ¶ 34.

20.     The Debtor and the City subsequently continued to negotiate their disputes and entered into a Standstill Agreement. *First Day Dec.,* D.I. 8, ¶ 24. The Standstill Agreement purportedly contained a litigation forbearance, which expired at 5:00 pm prevailing Eastern Time on June 2, 2022 (a day after the Petition Date). *First Day Dec.,* D.I. 8, ¶ 37.

21.     Upon information and belief, representatives of the Carolina Panthers, Appaloosa Management, L.P., and other Tepper-controlled entities were involved in the negotiations between the Debtor and the City.

22.     Following the suspension, Mark Hart and/or other persons within the Carolina Panthers organization continued to provide MBM with directives for goods and services per the Contract up to days before the Petition Date.

23.     MBM is currently owed nearly $80 Million under the Contract which is for labor and materials supporting valid mechanic's liens under S.C. Code § 29-5-10.

24.     Further, MBM also holds a claim in a currently undetermined amount for additional damages related to, or arising from, the Contract.

D.    **Questionable Insider Funding and Transactions with Insiders.**

25.    Between the time the Debtor issued a notice of default under the FCAA and the cure date, the Debtor transferred a valuable parking lot/facility located adjacent to the existing Carolina Panthers football stadium in Charlotte, North Carolina to PS Marks, LLC, yet another insider of the Debtor, for $15.5 million.  *First Day Dec.,* D.I. 8, ¶ 36.

26.    While the Debtor states that the parking lot/facility was purchased for the same price the Debtor paid for it "previously," it is unclear when that purchase occurred and the condition of that property at the time of the original acquisition.  The public record shows that the Carolina Panthers Stadium opened in 1996 - 26 years ago.  Without more information, it is impossible to ascertain at this time if this recent insider transaction was in exchange for less than equivalent value but it indisputably was made while the Debtor was insolvent.  It likewise appears that the Debtor made no effort to market the parking facility publicly or to maximize value.

27.    In the week leading up to the Petition Date, the Insider Lender/Owner extended financing via the Prepetition Insider Loans to the Debtor presumably to primarily fund the Debtor's Case professionals.[9]   As collateral for the Prepetition Insider Loans, the Debtor pledged another then-unencumbered asset - membership interests in the non-debtor, wholly-owned subsidiaries Waterford Golf Club, LLC and Waterford Golf Club 1, LLC (collectively, "Waterford").  *First Day Dec.,* D.I. 8, ¶ 39.  The first loan in the amount of $4.0 million purportedly was advanced on May 26, 2022 and the second loan in the amount of $3.2 million purportedly was advanced on

---

[9] MBM understands that the Debtor's professionals have been involved for months yet no retention applications have been filed in this Case.  Based on a cursory review of cases involving the Debtor's insiders, it appears the Debtor's bankruptcy counsel, White & Case was counsel for Appaloosa Management, L.P. in *In re Delphi Corporation*, Bankruptcy Case No. 05-44481 and Adversary Nos. 08-01232 and 08-01233 filed in the United States Bankruptcy Court for the Southern District of New York.  The Amended Complaint filed against Appaloosa Management, L.P. includes claims alleging, among other things, fraud.  *See, In re Delphi Corp. v. Appaloosa Management, L.P.*, 2008 WL 3486615, Exhibit E.  *See, also, Amended Complaint*, Exhibit G.

May 31, 2022.  The Insider Lender/Owner also took a mortgage on the golf course property(ies) owned by the Debtor's subsidiaries, thereby collateralizing any value that the Debtor's estate may have enjoyed in the assets.

28.    Other than Secured Trade Obligations, no other secured debt encumbered the Debtor's assets prior to the 11th hour Prepetition Insider Loans.

29.    The Debtor, by its own admission, does not continue to operate its business.  The Debtor has stated in its filings with this Court that it is not operating and instead has filed the Case to effectuate the Wind Down. *First Day Dec.,* D.I. 8, ¶12.  The Debtor has likewise taken this position publicly in various news and media outlets, suggesting no likelihood of rehabilitation, and continuing loss to, and diminution of, the Debtor's estate.

30.    Thus, leading up to the Petition Date, the woefully undercapitalized Debtor, who historically relied nearly exclusively on financial contributions from Affiliate Carolina Panthers, changed its historical ordinary course of conduct to remove or otherwise encumber valuable assets of the Debtor, in some instances *without* its "independent" 2-member board, and within just a few days before the filing *with* its "independent" 2-member board, which just happens to be comprised of one of Appaloosa Management's lawyers.  Counsel for the Debtor, who presumably would have had some oversight in connection with at least the Prepetition Insider Loans, likewise formerly represented Appaloosa Management.[10]

---

[10] MBM is by no means challenging the integrity of counsel for the Debtor.  However, MBM believes the Court, the United States Trustee, and other parties in interest should be aware of the entirety of its past relationship with insiders of the Debtor prior to granting further relief in connection with the DIP Financing Motion.  Heightened scrutiny is required when considering insider financing, and the facts surrounding this Case require a thorough analysis of *all* relationships before encumbering proceeds on avoidance actions or other assets, granting releases, and other such relief.

E.      **The DIP Financing Motion and Postpetition Events.**

31.     On June 2, 2022, the Debtor filed the DIP Financing Motion seeking entry of an interim order (the "<u>Interim DIP Order</u>") and later a Proposed Final DIP Order approving $20 million of postpetition financing (the "<u>DIP Financing Facility</u>") to be funded by the Debtor's Insider Lender/Owner, upon the terms and conditions of the DIP Credit Agreement attached to the DIP Financing Motion, the Interim DIP Order and the Proposed Final DIP Order.

32.     On June 6, 2022, the Court entered a modified Interim DIP Order.

33.     Numerous issues exist with respect to the proposed DIP Financing Facility and the Proposed Final DIP Order, such that it should not be approved, as more fully set forth below.

### III.      OBJECTIONS TO DIP FINANCING MOTION

A.      **The DIP Financing Facility is an Insider Transaction Subject to Heightened Scrutiny and Should not be Approved.**

34.     As a threshold matter, the incestuous facts and circumstances leading up to this Case and surrounding it to date mandate a "pause" with respect to the proposed financing while alternatives are explored, including the potential appointment of a chapter 11 trustee, conversion or dismissal.  Virtually every aspect of this Case is tainted by the control of Tepper and the Carolina Panthers, and the proposed DIP financing does not appear to be advanced in good faith. Rather, it is the catalyst for complete Case control, the elimination of any market testing of the Debtor's assets, and the inevitable delivery of those same assets and insider releases to Tepper, the Carolina Panthers, and the balance of Tepper's network of entities.

35.     The Project was constructed for the primary benefit of the Carolina Panthers – a Tepper-controlled entity.  Prior to the Petition Date, the ordinary course of business was for the Carolina Panthers to fund and direct the Project (importantly, without collateral or asset transfer,

as one would expect if the Project was, for all purposes, the Carolina Panthers' Project). Only "[u]pon the suspension of construction at the Project" (which occurred in March 2022), after "the Debtor recognized the need for a strategy to preserve and equitably distribute value to its creditors" did it retain professionals "to assist in its efforts . . ." (*DIP Financing Motion*, D.I. 9, ¶ 16) did the ordinary course of conduct change.  Suddenly, funding came from the sale and encumbering of the Debtor's assets to and by insiders – a diversion of value from creditors.

36.    A strategy was developed with a misleading goal: "ensuring the safety and security of the Project, preserving and maximizing the value of its assets for the benefit of its stakeholders, and administering a fair, efficient and timely process for resolving the claims arising from the demise of the Debtor's development project."  D.I. 9, ¶ 1. Those objectives are not chapter 11 objectives – no rehabilitation is contemplated – that is what chapter 7 is for.  This Case is being advanced for another purpose – to preserve Tepper's control, minimize market interference via the DIP Financing Facility and its Milestones and insulate the Panthers and other Tepper entities from potential litigation relating to pre-bankruptcy acts.  This Case is not about maximizing value for the benefit of the estate.

37.    Following are some of the more notable issues with the proposed DIP Facility that are detrimental to the creditors and benefit the Insider Lender/Owner and its Affiliates.

(i)    **The Debtor has not adequately attempted to secure alternative financing thereby barring relief under Section 364(c) of the Bankruptcy Code.**

38.    In support of its request for section 364(c) relief to incur secured or superpriority debt, the Debtor innocuously describes its effort to secure alternative financing from a single lender

(D.I.9, ¶ 18),[11] which is expounded upon in the Declaration of Jonathan Hickman in support of the

DIP Financing Motion (the "A&M Decl. in Support of DIP"):

> [P]rior to and immediately following the filing of this Chapter 11 Case, the Debtor has solicited a proposal for postpetition financing from an alternative source. Specifically, certain Debtor representatives asked a third-party lender with whom the Debtor already has an established relationship if that lender could offer equal or better terms for postpetition financing than those contemplated under the DIP Facility. As of the filing of this Declaration [June 2, 2022], the Debtor has received no response from that lender.

*A&M Decl. in Support of DIP*, D.I. 10, ¶ 15.

39.     First, A&M has been engaged since at least as early as March 2022, yet only one alternative source of financing has been contacted? If additional solicitation has occurred postpetition, MBM and the United States Trustee should be informed of each targeted alternative lender and their experience with construction and development loans.

40.     Second, the identity of the "certain Debtor representatives" that inquired about alternative financing must be disclosed. Mr. Hickman refers to "Debtor representatives" and the Debtor states it was one of the two officers. *DIP Financing Motion*, D.I. 9, ¶ 18. Considering the facts of this Case, including that one of the two board members is or was a lawyer for Appaloosa Management, more information is required to assess the propriety and value of this inquiry. At a minimum, the person(s) who made contact with this alleged alternative should be required to testify and be available for examination at the hearing on the Proposed Final DIP Order. Additionally, the Debtor identifies only two groups of secured creditors in this Case – the Insider Prepetition Debt and the Secured Trade Obligations, D.I. 9, ¶¶ 11-13, yet suggests that its board member contacted a lender with whom the Debtor already had an established relationship. Clarification is required.

---

[11] Although the Debtor erroneously states later in the DIP Financing Motion that the "Debtor has attempted to secure alternative debtor-in-possession financing **proposals**." (DIP Financing Motion, D.I. 9, ¶ 25).

41.     Section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

The Debtor cannot satisfy the requirements above of 364(c)(1) based on the record presented to date.

42.     Moreover, the Insider Lender/Owner's efforts to receive 364(c) security interests, liens and superpriority claims are unreasonable considering the current fact pattern. Insiders primarily funded the Debtor on an <u>unsecured</u> basis prior to the Petition Date and should do so now. Considering (a) Secured Trade Obligations encumber virtually all of the Project's assets as a matter of law, and (b) that Debtor's counsel stated during the First Day Hearings that Secured Trade Obligations are likely undersecured, the only plausible basis for the requested relief under 364(c) is that the Insider Lender/Owner seeks to encumber proceeds on chapter 5 actions and other estate actions, which is simply unfair considering the incestuous fact pattern surrounding this Case.

(ii)     **The failure to explore alternative financing sources results in other harm to the estate and in improper shift of leverage and benefit to insiders.**

43.     Failing to properly test the market for alternative financing sources results in other harm as well.  It deprives the bankruptcy estate of overall Case <u>optionality</u>, which is particularly problematic considering the web of insider influence and transactions surrounding this Case.

a.  While the Insider Lender/Owner suggests it is receiving a junior lien, it likewise does not have to worry about a non-debtor entity entering the Case who may have interests adverse to the insiders.  For instance, a third party interested in completing the project for alternative uses may have an interest in serving as a DIP lender and securing the vast number of benefits that come with it, such as the right to credit bid in connection with a section 363 sale of assets.  The Debtor has repeatedly stated that this Case is a Wind Down yet the Milestones curiously are devoid of a sale option.  In fact, the consummation of a sale of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code is an Event of Default and corresponding Termination Event under the Proposed DIP Financing.  D.I. 9, ¶ 16.  Approving the insider DIP financing forecloses the 363 sale opportunity, and with it the chances for section 365 contract assumption, which could fully satisfy more than 90% of the non-insider creditors in this Case and likely advance the goals of both the City and the County.

b.  By failing to shop the DIP financing, the Insider Lender/Owner likewise **_preserves control_**.  The Insider Lender/Owner gets the benefit of establishing deadlines that curtail if not wholly eliminate market testing of the estate assets.  The Milestones presently dictated by the Insider Lender/Owner require an Acceptable Plan[12] to be filed by July 31, 2022.  No sale alternative is referenced in the DIP Financing Motion, which by extension impairs potential value that would otherwise inure to the benefit of the holders of Secured Trade Obligations and the estate as a whole. As a result, the DIP Lender/Owner effectively can advance a plan that, among other things, yields minimal recovery to the estate as the value proposition at best will likely be "not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title." 11 U.S.C. § 1129(a)(7)(A)(ii).  In the meantime, the DIP Lender/Owner will inevitably seek broad releases (as it has already with respect to the proposed DIP Financing Facility) leaving creditors of this estate with few to no options at that point.  This begs the question -  why not convert the Case to chapter 7 and at least get the benefit of market testing, flexibility, less impairment to the capital structure, and the preservation of all claims (which is particularly important considering the ominous cloud of insider dealings in this Case)?

c.  Additionally, another factor that requires deeper inquiry before further relief is granted in connection with the DIP Financing Facility is the impact, if any, the $163.5 million in insider "loans" of the Carolina Panthers played in the Debtor's decision to restrict third party involvement. While MBM does not have information relating to what the Debtor and the Insider Lender/Owner plan to do with its Affiliate Carolina Panthers' purported claim of $163.5 million, an open process is preferred to the insider-driven process that is currently proposed to the Court. Again, the fact that Tepper controls the Insider Lender/Owner and the Carolina Panthers mandates market testing. MBM does not take much solace in the

---

[12] "Acceptable Plan" means a plan of reorganization for the Debtor that provides for the payment in full for all Obligations under the DIP Facility or is otherwise acceptable to the DIP Lender.

"independent board" based on its composition and has insufficient insight in the nature and extent of past relationships of the Debtor's professionals with insiders of the Debtor.

d.  If an alternative lender were in the mix, the vast number of protections for the Insider Lender/Owner and its Affiliates would not be in play and the risk of losing or otherwise impairing the potentially valuable actions against those same parties would be minimized.  As set forth below, the protections proposed for the Insider Lender/Owner and its Affiliates are entirely inappropriate considering the facts and circumstances surrounding this Case.

44.    The Insider Lender/Owner is the purported immediate parent of both the Debtor and the Carolina Panthers, who both are ultimately controlled by Tepper, a seasoned player in the bankruptcy space.  Entities owned and or controlled by Tepper have been involved in bankruptcy proceedings for decades and his success in dealing with distressed debt deals and transactions in this space is well known. Considering the history of insider dealings that predate this Case, including, without limitation, the fact that the Carolina Panthers have admittedly and directly paid the vast majority of development costs to date (most certainly due to the grossly undercapitalized shell company that is the Debtor), rigorous scrutiny must be given to the proposed financing.

45.    A court should approve proposed debtor-in-possession financing only if such financing "is in the best interest of the general creditor body." *In re Roblin Industries, Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983)); *see also In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D. N.H. 1989) ("The debtor's prevailing obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries").  Moreover, the proposed financing must be "fair, reasonable, and adequate." *In re Crouse Group, Inc.*, 71 B.R. 544, 546 (Bankr. E.D. Pa. 1987).

46.    Importantly, postpetition financing should not be authorized if its primary purpose is to benefit or improve the position of an entity other than the debtor. *See, e.g., In re Aqua Assocs.,*

123 B.R. 192, 195-98 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought

for the primary benefit of a party other than the debtor."); *In re Ames Dep't Stores, Inc.*, 115 B.R.

34, 37 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent

that the purpose of the financing is to benefit a creditor rather than the estate.").  Indeed, the law

has long acknowledged the unequal bargaining power inherent in negotiations leading to proposed

postpetition financing, as well as the very significant harm that can befall creditors if the proposed

financier is enabled to exploit its leverage position. *See, e.g., In re FCX, Inc.*, 54 B.R. 833, 838

(Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in

which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

47.     It is well established that insider transactions in bankruptcy cases must be carefully

scrutinized.  *See, e.g., In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("Since

there is an incentive and opportunity to take advantage, dominant shareholders' and other insiders'

loans in a bankruptcy must be subject to rigorous scrutiny."), *aff'd*, 198 F.3d 234 (2d Cir. 1999);

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re*

*Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to

rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith

of a transaction but also to show the inherent fairness from the viewpoint of the corporation and

those with interests therein."), *aff'd*, 160 F.3d 982 (3d Cir. 1998).

48.     Where debtor-in-possession financing is proposed to be provided by an insider,

such debtor-in-possession financing must be scrutinized under an "entire fairness" standard. *See*

Bench Ruling, *In re UCI International, LLC*, Case No. 16-11354 (MFW), D.I. 303, (Bankr. D.

Del. July 13, 2016) (applying entire fairness standard in denying DIP motion after considering the

debtor's prepetition conduct, that the lender was an insider of the debtor, and that it was not

immediately necessary for the debtor to have access to the DIP facility); *see also In re Los Angeles Dodgers, LLC*, 457 B.R. 308 (Bankr. D. Del. 2011) (finding that proposed DIP financing was not entirely fair because it uniquely benefitted the debtor's controlling shareholder to the bankruptcy estate's detriment).

49.    Postpetition financing should be approved only if "the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dep't Stores,* 115 B.R., at 40); *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hospital)*, 86 B.R. 393, 401–02 (Bankr E.D. Pa. 1988) (denying debtor's proposed postpetition financing arrangement with its parent in light of the parties' relationship and the circumstances of the transaction).

50.    Courts considering whether to approve postpetition financing have focused their attention on proposed terms that will prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors.  *See, e.g., In re MidState Raceway*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender."); *In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985).

51.    Given the facts and circumstances leading up to the commencement of this Case, the incestuous (if not intentionally fraudulent) use of the Debtor's business form by its insider Affiliates, and the fact that this Case is in Wind Down mode, it is clear the final relief sought in the DIP Financing Motion should be denied.  The vast majority of non-insider creditors in this Case are the holders of the senior Secured Trade Obligations.  Trading off, among other things, a real opportunity to advance a process that could yield a meaningful recovery to the Secured Trade

Obligations for the DIP Obligations, which bring with them the curtailment of market testing and significant fees for the Debtor's professionals and those of the Insider Lender/Owner[13] results in little benefit to the estate and is an unfair shift in leverage to the insider at the outset of the Case.

52.     Given the terms associated with the DIP Financing Facility, if the DIP Financing Motion were to be approved on a final basis, creditors (at best) will receive whatever gratuity Tepper wants to offer them, while he likely exits the Case with all assets and releases.  The proposed DIP financing uniquely benefits insiders – not the estate.

53.     The proposed DIP financing, and this Case in its entirety is an exercise of bad faith and under the heightened level of scrutiny that is required in this instance, the DIP Financing Motion should be denied.

**B.     The Debtor's Purported "Sound Exercise of Business Judgment" is Displaced and a Basis for the Immediate Appointment of a Chapter 11 Trustee.**

54.     Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re L.A. Dodgers LLC*, 457 B.R., at 313.  The proposed DIP Financing Facility runs afoul of provisions and policies underlying the Bankruptcy Code.  The following summary of facts support this statement:

   a.   This Case is structured to benefit insiders and not creditors.

   b.   This Case is touted as a liquidation/Wind Down.

   c.   Typically, creditors receive recoveries in bankruptcy from either a debtor's revenue, the sale of its assets, or avoidance actions.

---

[13] These fees are described in the Summary of the DIP Facility (D.I. 9, ¶. 10) and further described in the proposed DIP Order.  While these fees may be appropriate for a non-insider lender, considering the scope of the Collateral includes, among other things, the Debtor's right of surcharge under section 506(c) (which of course could negatively impact the mechanics and materialman's liens the Debtor purportedly is attempting to protect), proceeds from certain chapter V actions, commercial tort claims, insurance proceeds, and other estate actions that relate to the prepetition insider network and relationships, these fees are potentially problematic and inappropriate.  Also, the fees include costs associated with the Roll-Up DIP Loan, which pre-dated the Petition Date.

   d.  There is no revenue in this Case.

   e.  The DIP Milestones established by the Insider Lender/Owner neither contemplate
       nor temporally allow for a sale process.

      i.  A 363 sale (that would be subject to higher or better offers) is an Event of
          Default that gives rise to the financing Termination Date.

     ii.  Upon an Event of Default, the automatic stay is lifted for the benefit of the
          Insider Lender/Owner to exercise all rights, subject to the Debtor's right to
          an emergency hearing to challenge stay relief, which right is impaired by
          the required stipulations in the Interim DIP Order.

    iii.  A plan acceptable to the Insider Lender/Owner must be filed by July 31,
          2022 and confirmed by September 30, 2022 or it is an Event of Default.
          Thus, the possibility of a sale (subject to higher or better offers) for the
          Debtor's assets is effectively eliminated.

   f.  The terms of the DIP Financing Facility effectively eliminate the estate's value of
       potential actions against insiders.  Debtor seeks to encumber the proceeds of
       avoidance actions and grant direct liens on other actions against insiders.
       Additionally, the challenge rights are ineffective if not illusory. With those terms,
       coupled with Milestones that fast track an insider plan (that will undoubtedly
       require releases), this source of recovery is effectively lost.

55.    While many of the protections set forth in the proposed DIP Financing Facility are

common in chapter 11 cases, those cases typically do not involve DIP financing in which: (a) an

insider is the lender, (b) the disputes giving rise to the filing of the chapter 11 case were at least

partly caused by the insider, (c) only a single alternative financing option was explored, (d) the

person who sought out the single alternative source of financing was one of the two board members

hired days before the filing of the bankruptcy case, (d) the insider selected (or at least vetted and

approved) the two board members, (e) one of the two people hired to serve as a board member

is/was counsel for the insider's hedge fund (and may have been the person exploring alternative

financing), (f) the debtor's professionals have worked for the insider before, (g) the primary

purpose of the debtor's business was to support another insider, and (g) the insider has another insider's debt (the Carolina Panthers $163.5 million claim) to protect.

56.     In addition, all of this must be considered with the backdrop of the pervasive non-debtor control and confused intermingling of business activity that pre-dated the Petition Date. Considering the stated purpose of this Case, the availability of achieving the same in a chapter 7 case, and the nature and extent of rights being compromised and/or waived to advance this DIP Financing Facility, there was no "sound exercise of business judgment."  "Cases consistently reflect that the court's discretion under 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dep't Stores*, 115 B.R., at 40.  The DIP Financing Facility both leverages the bankruptcy process and is tailored to benefit the insiders – not the estate. If approved, recoveries to creditors will not be dictated by the market value of estate assets – they will be dictated by Tepper.  If this is, in fact, an exercise of the Debtor's business judgment, the Debtor should be dispossessed, the hand-picked board and CRO should be removed and a Chapter 11 Trustee should be appointed immediately.

## C.     The Insider Lender/Owner is not a Good Faith Lender

57.     Tepper is one of the most seasoned and crafty players in the distressed market space.  He has made his career in leveraging distressed situations to his benefit.  The Insider Lender/Owner is controlled by Tepper.  As such, the Insider Lender/Owner is uniquely aware of how to best posture itself to maximize the benefit of this Case for itself and minimize the return to legitimate creditors.  The Insider Lender/Owner is cognizant of the risks associated with bringing in an unrelated, third-party lender.  The Insider Lender/Owner is likewise acutely aware of the

potential loss of leverage and financial recovery to its Affiliates if the asset is subject to a marketing process and 363 sale.  Additionally, the Insider Lender/Owner is aware of the pre-bankruptcy missteps it and its Affiliate (the Carolina Panthers) have made pre-bankruptcy and the potential financial exposure and collateral damage that could occur if it is unable to secure releases or otherwise insulate those entities through this Case.  No creditor committee has been formed and the Insider Lender/Owner is likely aware of the challenges others will have to secure derivative standing to prosecute claims.

58.    The DIP Financing Facility restricts involvement by third-party market participants and, by extension, impairs potential recoveries.  It places the Case on a fast track plan process that must be acceptable by the Insider Lender/Owner.  The Insider Lender/Owner is in the best position to estimate liquidation value of the Debtor's assets, which, without market-testing, will leave creditors in the unenviable position of being asked to take whatever remains after the DIP Obligations are paid in full.

59.    The alleged "good faith" negotiations, if they occurred, involved the Insider Lender/Owner and two "independent" board members, one of whom currently or formerly represented Tepper's hedge fund Appaloosa Management.  The CRO's testimony is that, to his knowledge, the Insider Lender/Owner did not influence or interfere with the Debtor's board members as they made the decision to enter into the DIP Financing Facility.  *A&M Decl. in Support of DIP,*  D.I. 10, ¶ 16.  MBM submits Mr. Hickman's conjecture is not enough.  Considering the facts and circumstances surrounding this Case, discovery is required to avoid what otherwise could be an abuse of process, if not something worse.

60.    No good faith finding should be made nor relief under Section 364(e) granted. Parties in interest should be given the opportunity to investigate these alleged negotiations.

**D.** **The Debtor Has Neither Adequately Explained a Need for the DIP Financing Facility Nor a Reasonable Basis for Seeking Relief in Chapter 11 as Opposed to Chapter 7.**

61.    Considering the projected impact the DIP Obligations have on creditor recoveries, the Debtor must better explain how it sized the $20 million DIP Financing Facility and why it opted for a chapter 11 process rather than a chapter 7 process.

62.    Taken at face value, the 13-week budget reflects that only $6,487,000 will be drawn from the $20 million DIP Financing Facility.  A significant amount of the $6,487,000 million in DIP Financing Facility proceeds are simply being used to fund the bankruptcy process of this Case rather than advancing the wind down and claims reconciliation process in a chapter 7.  In light of the fact that no reorganization or rehabilitation is even contemplated, coupled with the fact that the Milestones (and the DIP Financing Facility itself) restrict exposing the Debtor's assets to the market, the DIP Financing Motion should not be approved absent clarification of the projected costs through the period described in the Milestones and further explanation why this Case is being advanced in a chapter 11 rather than a chapter 7.

**E.** **A Challenge Requirement is Inappropriate Under the Facts of this Case, as is the Encumbering of Proceeds from Avoidance Actions.**

63.    Considering the facts and circumstances surrounding this Case, the historical funding of this Debtor, the change in the ordinary course of that funding following the suspension of the Project and during the course of negotiations with the City and County, the challenge requirements are wholly inappropriate and further support denial of the DIP Financing Motion.

64.    Because the DIP Financing Facility is an insider transaction and there are a number of questionable insider transactions and dealings by and among the Debtor and its various Affiliates, a requirement that creditors and other parties in interest must bring a "Challenge" by a date that is seventy-five (75) calendar days from entry of the Interim DIP Order is inappropriate.

65.    Simply put, under the set of facts present in this Case, creditors and other parties in interest must have the full breadth and duration provided under the Bankruptcy Code to attempt to preserve and maximize potential recoveries from avoidance actions.

66.    Based upon the scope and depth of the investigation necessary as a result of the murky and suspicious structure that is the Debtor/Tepper/Carolina Panthers enterprise, the Debtor cannot meet its burden to prove that the challenge requirement (or the financing as a whole) is being proposed in good faith and is "inherently fair" to creditors.

67.    To the extent the Court allows any further financing and is likewise inclined to establish anything but unfettered challenge rights, the challenge requirement may be illusory unless the Debtor agrees to a mechanism by which an individual creditor or other party in interest may prosecute a challenge.[14] *See, e.g. In re Rudy's Barbershop Holdings LLC*, Case No. 20- 10746 (Bankr. D. Del.) [Docket No. 10] at 48-49 (Interim DIP/Cash Collateral Order), [Docket No. 144] at 50-51 (Final DIP/Cash Collateral Order) (court required final DIP order to include language that the parties will amend their LLC agreements to permit challenges and derivative actions).  In addition, MBM (and perhaps others) should be added as a notice party everywhere in the proposed order that a creditors committee was identified so that MBM may have an opportunity to act.

**F.    The Releases are Overly Broad and Inappropriate for Affiliates, Especially in Light of the Suspicious Insider Dealings Involving this Debtor.**

68.    The Proposed Final DIP Order at paragraph E(x) seeks broad releases of the Insider Lender/Owner, along with its Affiliates and agents and representatives. Paragraph E(x) provides:

(x)    Release. Subject to entry of a Final Order, the Debtor forever and irrevocably releases, discharges, and acquits (a) the DIP Lender, (b) the Prepetition Secured Lender, (c) **Affiliates of the DIP Lender, and (d) officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers,**

---

[14] No creditors committee has been appointed in this case.

**consultants, accountants, attorneys, and predecessors and successors in interest of the DIP Lender and its Affiliates** (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, **arising out of, in connection with, or relating to the DIP Facility, the DIP Documents, the Prepetition Debt Documents relating to the Subsequent Prepetition Secured Note and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims held by the Prepetition Secured Lender and DIP Lender. The Debtor further waives and releases any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Note and the DIP Obligations which the Debtor now has or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Interim Order.**

(Emphasis added).

69.     A release in favor of the Insider Lender, "Affiliates", and "officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, and predecessors and successors in interest of the DIP Lender and its Affiliates" is overly broad and should not be granted in light of the DIP Facility being an insider transaction and the intertwined and suspicious dealings by and among the Debtor and its various Affiliates. This is particularly so considering the Insider Lender's expansion of the Bankruptcy Code's definition of "Affiliate" in the DIP Credit Agreement (D.I. 9-2, p. 5) and the breadth of the term "control" therein. Arguably, this expanded definition of "Affiliate" could include any entity or Person within the larger Tepper enterprise. It is also problematic considering the proposed continuation of

insider transactions with non-debtors as defined in Permitted Affiliate Transactions, Permitted Intercompany Advances, and Permitted Investments (D.I. 9-2, pp. 10-11) (all of which transactions, advances, and investments should be subject to full disclosure to the Court and all parties-in-interest).

70.     The above release provision would shield the Insider Lender/Owner, its Affiliates and other representatives from any and all past, present, and future claims related "to the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called 'lender liability' or equitable subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims held by the Prepetition Secured Lender and DIP Lender."

71.     The proposed releases are yet another reason this Court should deny the DIP Financing Motion.  The Court should reject the Debtor's attempt to shield its insiders from liability, including for causes of action unrelated to the proposed financing.

72.     With respect to a debtor's release of non-debtors as part of a chapter 11 plan (where releases are generally addressed in a bankruptcy case), for instance, the Courts in this District have routinely applied a non-exclusive five-factor test set forth in *Master Mortgage* to determine whether such releases are appropriate:

> (1)     the "identity of interest between the debtor and the third party, . . . such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate";

> (2)     substantial contribution by the non-debtor of assets to the reorganization;

> (3)     the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

      (4)     an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

      (5)     a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994); *see also In re Abeinsa Holding, Inc.*, 562 B.R. 265, 282 (Bankr. D. Del. 2016) (applying the 5-factor *Master Mortgage* test to debtors' proposed release of third parties); *In re Wash. Mut. Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (the "factors articulated in *Master Mortgage* form the foundation" for the analysis of whether a debtor's release of third parties is appropriate); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (applying the five-factor *Master Mortgage* test to debtors' release of third parties).

      73.     Although no single factor is dispositive, courts in this district have focused the analysis on whether the parties to be released have provided a substantial contribution to the plan. *See Wash. Mut.*, 442 B.R. at 349-50 (approving releases of parties that had waived significant claims against the debtors' assets and the estates but concluding that "there is no basis whatsoever for the Debtors to grant a release to directors and officers or any professionals . . . current or former . . . [because] there has been no evidence presented of any 'substantial contribution' made to the case by the directors, officers or professionals, justifying releases for those parties."). Courts do not grant third-party plan releases lightly, and the plan proponent bears the burden of establishing the appropriateness of the non-debtor releases. *See Zenith Elecs. Corp.*, 241 B.R. at 110 (releases by the debtor against third parties may be provided under certain limited circumstances); *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 43 (Bankr. D. Del. 2000) (noting that it is the debtors' burden to establish that releases are appropriate). Importantly, in order for a party to make a "substantial

contribution" worthy of a plan release, the party must contribute something tangible to the Plan, whether in the form of cash or providing an "extraordinary service" to the case. *In re Wash. Mut., Inc.*, 442 B.R. at 348.

74.     Setting aside the fact that the relief sought by the Debtor and the Insider Lender/Owner is outside the context of a plan process, which provides significantly greater protections to creditors and parties in interest, the DIP Financing Motion fails to provide *any* analysis as to why the releases are essential to the DIP Financing and/or how the Released Parties have made a "substantial contribution" to support the proposed releases. *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) (holding that releases must be given in exchange for fair consideration).

75.     Moreover, the release provision essentially becomes a third-party release if a timely challenge is not commenced by a creditor or party in interest.  Even in the plan context, although the Third Circuit has not adopted a *per se* rule that nonconsensual third-party releases are impermissible, it has made clear that such releases are proper only in extraordinary cases. *In re Cont'l Airlines*, 203 F.3d 203, 212 (3d Cir. 2000) (concluding that third-party releases are valid only in "extraordinary" circumstances); *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (quoting *Cont'l Airlines*) (nonconsensual releases permitted in exceptional circumstances when adequate record in support was developed); *In re Prussia Assoc.*, 322 B.R. 572, 596 (Bankr. E.D. Pa. 2005) (citing *Cont'l Airlines*); *In re Exide Tech.*, 303 B.R. at 72 (same); *see also In re Genesis Health Ventures, Inc.*, 266. B.R. at 608 (finding that nonconsensual third party release was a "rare thing" that should only be considered in exceptional circumstances); *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) (finding that third party releases of claims held by parties who are receiving no contribution under the plan is not appropriate).

76.     At this early stage, this Case is not reflective of such rare or extraordinary cases. In fact, the extraordinary facts and circumstances weigh heavily *against* granting such relief.

77.     The release is even more problematic in this Case because the Insider Lender/Owner is effectively on both sides of the transaction, and therefore it effectively is seeking to release itself from liability to the company it controls. *See In re Outer Harbor Terminal, LLC*, No. 16-10283 (LSS), 2017 Bankr. LEXIS 1263, at *31 (Bankr. D. Del. May 5, 2017) (interpreting DIP order releases not to extend to avoidance actions against lenders' affiliates who were "also insiders of the Debtor" because those parties' separate "relationships are not the subject of the Final DIP Order").

78.     For the foregoing reasons, again, the DIP Financing Motion should be denied.

**G.     The Roll-Up Loan is Inappropriate Under the Facts of this Case.**

79.     As part of the DIP Facility, the DIP Financing Motion seeks approval of the roll-up of a prepetition loan in the amount of $3.4 million (the "Roll-Up Loan"), and converts it into a postpetition obligation under the DIP Facility with corresponding broader security interests in all of the Debtor's otherwise unencumbered assets.[15]

80.     Notwithstanding the fact that the Insider Lender made the Roll-Up Loan on the eve of the Petition Date and contemporaneously obtained a pledge of collateral, guarantees from the Debtor's subsidiaries and a mortgage, the proposed Roll-Up Loan (if approved) allows the Insider Lender to shore up its prepetition secured status by converting the debt into postpetition debt that is secured with estate assets that are not currently encumbered, including but not limited to, cash, proceeds of avoidance actions, and other tangible and intangible assets.

---

[15] The additional collateral package is particularly concerning where, as here, the Debtor has not filed schedules (despite the limited universe of creditors and assets in this case) and the extent and value of its assets are not known.

81.     Any unencumbered assets must be preserved for the benefit of the Debtor's non-insider creditors (or, perhaps more appropriately here, preserved to fund a chapter 7 liquidation). See, *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"). *See also, e.g., In re Kaib*, 448 B.R. 373, 376 n.2 (Bankr. W.D. Pa. 2011) (noting that cross-collateralization is generally disallowed in bankruptcy).

82.     At this early date, the entirety of assets which will be swept up by the Insider Lender/Owner through the Roll-Up Loan is impossible to know.  Given the number of hats worn by the Insider Lender/Owner and its Affiliates, the proposed Roll-Up Loan should be denied.

83.     Additionally, the Debtor states in the DIP Financing Motion that the Roll-Up was necessary to make payments to protect the Project and to enter the chapter 11 in an organized manner.  Considering the Debtor's stated goals of this Case and the viable option of a chapter 7, if the Court is inclined to allow for any further postpetition financing, no further relief should be granted in relation to the Roll-Up absent full disclosure of the uses of those funds.

84.     The Debtor further states that "parties-in-interest are unharmed by the roll-up, as all parties with standing to challenge the Prepetition Secured Note have such rights expressly reserved."  D.I. 9 ¶30.  Considering there is no creditors committee in this Case and some of the challenges that may exist with respect to securing derivative standing, absent elimination of the challenge hurdles presented in the DIP Financing Motion and Proposed Final DIP Order, this statement is yet another example suggesting that the case is being advanced for insiders.

**H.** **The Insider Lender Should Not Accrue the Unqualified Right to Credit Bid as Part of the DIP Financing Facility.**

85.     Pursuant to paragraph 4 of the Proposed Final Order, "the DIP Lender shall have, subject to Section 363(k) of the Bankruptcy Code, the unqualified right to credit bid (x) up to the full amount of the DIP Obligations, and (y) the DIP Superpriority Claim without the need for further Court order authorizing the same."

86.     Considering the structural impairment inherent in the DIP Financing documents and Proposed Final DIP Order, the breadth and depth of the prepetition insider transactions, and the fact that the DIP Facility is an insider transaction, the Insider Lender's credit bid rights should not be unqualified and should not be determined at such an early stage of the Case.  Again, cause exists to deny the DIP Financing Motion at this time while alternatives are explored, including the possibility of appointing a chapter 11 trustee, conversion or dismissal.

**I.** **Insider Lender Liens with Respect to Avoidance Actions or Proceeds are Wholly Inappropriate.**

87.     MBM objects to liens, superpriority claims, adequate protection claims, or any other claims being granted to the Insider Lender/Owner with respect to Avoidance Actions and other potential claims and the proceeds thereof.

88.     Given the size of the DIP facility and the proposed uses, the value of previously unencumbered assets must be preserved for the benefit of the Debtor's non-insider creditors.

89.     Additionally, it is well established that avoidance actions can only be exercised for the benefit of the debtor's estate.  *Bear Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (noting that the purpose of section 547 is to ensure fair distribution between creditors, and "***the purpose of [section 548] is to protect the estate itself for the benefit of all creditors***") (emphasis added). Avoidance actions are rights that the estate holds for the benefit of creditors.

*See In re Cybergenics Corp.,* 330 F.3d 548, 566–67 (3d Cir. 2000); *Buncher Co. v. Official Comm. Of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000).

90.     To allow the Debtor to effectively assign estate claims and the proceeds thereof to its parent, the Insider Lender/Owner, as opposed to preserving such claims for the benefit of unsecured creditors, turns bankruptcy law on its head and is yet another reason the DIP Financing Motion should be denied.   The Debtor's legitimate non-insider creditors should not be a source of recovery for the Insider Lender/Owner.  Moreover, considering the likelihood that the Debtor's Affiliates and other insiders (such as the Carolina Panthers) are likely targets of the bankruptcy estate, any encumbrance on proceeds of such actions for the benefit of those same parties would be patently unjust.  This is particularly so when the Debtor's stated purpose for the Case can easily be accomplished under chapter 7, and at a lower cost and without such impairment.

91.     Given that avoidance actions and the proceeds thereof are designed to protect the interests of all creditors, under no circumstances should the Insider Lender/Owner receive liens or superpriority claims on any chapter 5 claims or their proceeds.

**J.     The Proposed Section 506(c) Waiver is Unwarranted.**

92.     The DIP Financing Motion provides that, subject to the entry of the Final Order, the Debtor will waive its rights under section 506(c) of the Bankruptcy Code to surcharge the DIP Collateral for the costs of preserving or disposing of such collateral.  Such rights are granted to the Debtor by statute, and exist to protect the estates from administrative expenses that only inure to the benefit of the lender whose collateral is being preserved or disposed of. 11 U.S.C. § 506(c); *see also In re Visual Industries, Inc.*, 57 F.3d 321, 325-26 (3d Cir. 1995). Section 506(c) was designed to prevent a "windfall to the secured creditor at the expense of the claimant." *Id.* (citation

omitted). Accordingly, section 506(c) "understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . ." *Id.*

93.     The Supreme Court has held that waivers of rights provided under section 506(c) must not be granted lightly, and a debtor's management may only agree to such a waiver for the most compelling of reasons as the waiver is binding on all parties in interest. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000) (Section 506(c) is a rule of fundamental fairness to all parties in interest; the authorization to surcharge a secured lender's collateral is proper where it is reasonable and appropriate, and a debtor's decision to waive such rights must be made in a manner consistent with its obligations to "seek recovery under the section whenever [a debtor's] fiduciary duties so require."); *see also* Local Rule 4001- 2(a)(i)(C) (requiring debtor to justify provisions that waive rights under section 506(c)).

94.     Significantly, courts in the District of Delaware have been hesitant to allow section 506(c) waivers, especially over objection. *See, e.g., In re EBH Topco, LLC*, Case No. 18-11212 (BLS), Hr'g Tr. (ECF No. 226) at 69:8-22 (Bankr. D. Del. June 26, 2018); *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS), Hr'g Tr. (ECF No. 3927) at 212:12-22 (Bankr. D. Del. June 5, 2014) (declining to approve a 506(c) waiver over objection and stating that "Judge Walsh once told me that he'd never approve a 506(c) waiver on a non-consensual basis"); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW), Hr'g Tr. (ECF No. 224) at 101:7-13 (Bankr. D. Del. July 13, 2010) ("[Y]ou don't give a 506[(c)] waiver over an objection by the committee . . . . So I would not be inclined to give a 506(c) waiver"). *In re Syntax-Brillian Corp.*, Case No. 08- 11407 (BLS) (ECF No. 237) at 73:7-10 (Bankr. D. Del. July 30, 2008) ("I don't believe that I had previously approved a section 506(c) waiver over a committee objection and I'm not confident that

I would be prepared to do so in the circumstances of this case.").  Even though a creditors committee has not been appointed in this Case, MBM, as the at-risk contract manager and general contractor for its 68+ subcontractors, comprises the vast majority of the non-insider indebtedness in this Case.  MBM objects to any section 506(c) waivers, especially considering the Debtor has chosen to pursue its Wind Down utilizing the vastly more expensive chapter 11 process as opposed to chapter 7 .

**K.**      **The Proposed Waivers of the "Equities of the Case" Exception Under Section 552(b) and Other Equitable Doctrines are Unjustified.**

95.      As an initial matter, MBM does not believe that section 552 applies in these cases, insofar as the Insider Lender/Owner was not a party to a prepetition security agreement with the Debtor covering most of the collateral. To the extent that the Debtor and Insider Lender/Owner argue that section 552 is applicable, MBM nevertheless believes such waivers are inappropriate.

96.      Arguably, section 552(b) restores a postpetition lien on certain proceeds of inventory, accounts receivable, and similar assets that section 552(a) cuts off. Section 552(b), however, permits a court, after notice and a hearing, and based on the equities of the Case, to rule otherwise.

97.      MBM objects to the waiver of the "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code. The Debtor cannot establish why such statutory and equitable powers should be surrendered at this early stage, especially considering the facts surrounding this Case. In essence, the Debtor, on behalf of the Insider Lender/Owner, is asking the Court to rule in advance that there are no, nor will there ever be, equities of the Case that may justify abrogating Inside Lender/Owner's postpetition liens granted for any reason.

98.     "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of assets of the estate (which normally would go to general creditors) to cause the appreciated value." *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) (citation omitted).

99.     As a general proposition, at this early stage of the Case, it is inappropriate for the Debtor to waive rights under section 552(b). *In re TerreStar Networks, Inc.*, 457 B.R. 254, 272-73 (Bankr. S.D.N.Y. 2011) (denying waiver of section 552(b) as premature because factual record was not fully developed).  This is particularly so in this Case.

100.     MBM also believes a waiver of marshalling rights would be inappropriate at this time. The concept of marshalling could ensure that the DIP lender turn to certain assets as opposed to others in collecting on its claims in order to maximize recoveries to all constituents such as other creditors. "[Marshalling] requires the senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit." *In re Advanced Marketing Servs.*, Inc., 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007). Marshalling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 236 (1963).

101.     The Debtor has standing to assert marshalling rights pursuant to section 544(a) of the Bankruptcy Code. *See, e.g., United States v. Houghton (In re Szwyd),* 408 B.R. 547, 550 (D. Mass. 2009); *Kittay v. Atl. Bank of N.Y. (In re Global Serv. Grp. LLC)*, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004); *Official Comm. of Unsecured Creditors v. Lozinski (In re High Strength Steel, Inc.)*, 269 B.R. 560, 573-74 (Bankr. D. Del. 2001).

102.    Here, through the proposed DIP Financing Facility, previously unencumbered assets would become collateral securing the DIP Facility for the benefit of the Insider Lender/Owner and Affiliates.  Considering the morass of inter-company transactions and intermingling of business affairs that occurred pre-bankruptcy and the absence of clarity associated with the same, the general blanket waiver of marshalling, and the attempt to avoid the requirements of section 552(b) is wholly inappropriate.  No such relief should be granted.

**L.    The Workers' Trust Escrow Account Should be Funded and the Workers Trust Beneficiaries Should be Paid.**

103.    The DIP Budget shows that the Workers Trust Escrow Account was to be funded the week of June 10, 2022.  That has not occurred.

104.    While MBM hopes the representations made by the Debtor and its professionals to secure interim DIP financing and the relief granted therein were sincere, the fact that the former employees of the Project have not been paid what was promised is telling – especially if the Subsequent Prepetition Secured Note was paid in connection with the Roll-Up.

105.    Failure to fund and process the Workers Trust Escrow Account would further support MBM's suspicion that this Case is being advanced for insiders and not the parties to whom this Debtor and its newly appointed management owe a fiduciary duty.

**M.    Other Objections.**

106.    To the extent the Court is inclined to enter a Final DIP Financing Order, in addition to the foregoing objections, MBM also requests that the Court consider the following objections to the Proposed Final Order:

- The definition of "Permitted Mechanic's Liens" potentially curtails the statutory rights of mechanic's lien holders.  Permitted Mechanic's Liens should be

defined as valid mechanics, materialman's or artisan liens under applicable state law regardless of time of filing, service, or perfection.

- The Milestones should extend the deadline for filing of a plan and provide for the immediate commencement of a commercially reasonable sale process. The Debtor's assets should be subjected to the market for higher and better offers by non-insider parties and full disclosure to MBM and all other subcontractors.

- The DIP Budget should provide projections through the balance of the Case so that all parties, including the United States Trustee, MBM and other lienholders and parties in interest can assess the propriety of this Case and alternatives.

- All references to notice to be given to the Creditors Committee should be replaced to include MBM and all other statutory lienholders.

- Finding C should state that no Creditors Committee has been formed.

- The Proposed Final Order should include the following: "To the extent any inconsistency exists between this Order, the Motion, the DIP Credit Agreement and any other document prepared, amended, or related/affixed thereto, the terms of this Order shall control."

- The Debtor's Stipulations relating to the Enforceability of the Prepetition Secured Notes in Finding E(iv) should be prefaced with: "After making due inquiry . . .."

- Absent sufficient evidence from the Debtor, the Court should not make the findings in paragraphs F, G, H, I, J and K of the Proposed Final Order and MBM as well as other parties in interest should be afforded an opportunity to conduct

discovery relating to the same in advance of a continued hearing on the Proposed Final DIP Order.

- In addition to the other parties entitled to receive the fees statement of the DIP Lender and its advisors and professional pursuant paragraph 20 of the Proposed Final DIP Order, MBM should also receive such fees statements.

- In Paragraph 20(b) of the Proposed Final DIP Order, the Debtor should not be required to pay the expenses of the DIP Lender/Owner "whether or not the transactions contemplated hereby are fully consummated," and such language should be stricken.

- Any material amendments to the DIP Financing Facility should be subject to court approval.

- To the extent and indemnity rights are afforded the DIP Lender/Owner, such rights should not extend to Affiliates.

- If the Court is inclined to provide for a Challenge Period, the date should be no less than 90 calendar days following entry of the Final DIP Order and such right to Challenge shall not be reserved for just a Creditors Committee.

- The Proposed Final Order should include the following language: "Notwithstanding anything contained to the contrary herein, no waivers, injunctions, indemnification rights, or other relief granted to the DIP Lender shall extend to the Carolina Panthers or anyone affiliated therewith."

## IV.   <u>RESERVATION OF RIGHTS</u>

107.   As of the filing of this Objection, MBM continues to engage in investigation of applicable facts and intends to continue discussions with the Debtor concerning many issues, not

all of which are raised in this Objection.   Accordingly, MBM reserves all of its rights to supplement or amend this Objection at or prior to the final hearing on the DIP Financing Motion. MBM also reserves all of its rights with respect to any filing by the Debtor, the Insider Lender/Owner or any other party prior to the final hearing or otherwise.  Nothing contained in this Objection constitutes an admission or stipulation by MBM with respect to the amount, validity, and enforceability of any alleged claims against the Debtor or the extent, validity, priority, or perfection of any alleged liens and security interests in the Debtor's assets.  MBM expressly reserves all rights with respect to its claim(s), including, without limitation, the rights to make, amend or withdraw any such claim(s) and to the rights of setoff and/or recoupment.

## V.   <u>CONCLUSION</u>

Tepper and representatives and employees of the Carolina Panthers invited MBM to construct the Project, directly negotiated the Contract for the Project with MBM, signed the Contract for the Project, paid MBM from a Panthers' checking account, and gave direction on how MBM was to proceed all through the Project's execution, from inception through to the eve of the Petition Date.   It is inequitable that Tepper and the Carolina Panthers now seek to commandeer this process through the proposed financing for the primary benefit of those insiders who brought us here in the first place.

In light of the foregoing, Mascaro/Barton Malow, a Joint Venture, respectfully requests that the Court deny approval of the DIP Financing Motion on a final basis, and grant such other relief as the Court determines.

*Remainder of page intentionally left blank.*

41

Dated: June 22, 2022  
Wilmington, Delaware  

*/s/ Richard W. Riley*  
**WHITEFORD, TAYLOR & PRESTON LLC**[16]  
Richard W. Riley (DE No. 4052)  
600 North King Street, Suite 300  
Wilmington, Delaware 19801  
Telephone:  (302) 353-4144  
Facsimile:  (302) 661-7950  
Email:  rriley@wtplaw.com  

-and-  

Michael J. Roeschenthaler, Esq.  
Scott M. Hare, Esq.  
Kenneth J. Lund, Esq.  
**WHITEFORD TAYLOR & PRESTON L.L.P.**  
200 First Avenue, Third Floor  
Pittsburgh, PA 15222  
Telephone:  (412) 618 - 5800  
Facsimile:  (412) 275 - 2406  
Email:  mroeschenthaler@wtplaw.com  
share@wtplaw.com  
klund@wtplaw.com  

*Counsel for Mascaro/Barton Malow, a Joint Venture*

---

[16]     Whiteford, Taylor & Preston LLC operates as Whiteford Taylor & Preston L.L.P. in jurisdictions outside of Delaware.